UNITED STATES of America,
Plaintiff–Appellee,

v.

Nelson ITALIANO,
Defendant–Appellant.

No. 87–3201.

United States Court of Appeals,
Eleventh Circuit.

Feb. 22, 1988.

John R. Lawson, Jr., Richard W. Reeves, Stephen O. Decker, Lawson, McWhirter, Grandoff & Reeves, Tampa, Fla., for defendant-appellant.

Robert W. Merkle, U.S. Atty., David H. Runyan, Terry A. Zitek, Asst. U.S. Attys., Tampa, Fla., for plaintiff-appellee.

Before VANCE and HATCHETT, Circuit Judges, and OWENS*, Chief District Judge.

HATCHETT, Circuit Judge:

In this criminal appeal, we are called upon to determine whether the Supreme Court's recent interpretation of the federal mail fraud statute in *McNally v. United States*, 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) is applicable in a slightly different factual scenario. Holding that *McNally* applies, we vacate the conviction and judgment.

## FACTS

Appellant, Nelson A. Italiano worked for Coaxial Communications of the Suncoast, Inc. (Coaxial Communications), a corporation formed for the purpose of obtaining a cable television franchise contract with the city of Tampa, Florida. In seeking to obtain the city of Tampa franchise, Coaxial Communications decided to establish a presence in the area by securing franchises in the neighboring city of Temple Terrace and in Hillsborough County. Although

---

* Honorable Wilbur D. Owens, Jr., Chief U.S. District Judge for the Middle District of Georgia, sitting by designation.

less lucrative, Coaxial Communications' management believed that the establishment of these franchises would enhance the company's chances of obtaining the city of Tampa franchise.

In the spring of 1980, Italiano approached Charles F. Bean, a Hillsborough County commissioner, and indicated to Bean that Coaxial Communications was interested in obtaining a cable television franchise. Italiano told Bean that the owner of Coaxial Communications was a wealthy man and that Bean might anticipate amassing great wealth if he supported Coaxial Communication's efforts to obtain the cable television franchise. After having conversations with fellow-commissioners Robert Curry and Jerry Bowmer, Bean learned that Curry and Bowmer were also committed to supporting Coaxial Communication's efforts to be awarded the franchise.

On June 11, 1980, by a margin of three-to-two, the Hillsborough County Board of County Commissioners voted to grant a cable television franchise to Coaxial Communications. County Commissioners Bean, Curry, and Bowmer voted for Coaxial Communications; Commissioners Platt and Davin voted against Coaxial Communications. On July 23, 1980, the Hillsborough County Commission ratified the contract between Hillsborough County and Coaxial Communications by an identical three-to-two vote.

Between the time of the awarding of the franchise contract and its ratification, Italiano gave Bean envelopes containing $2,500 in cash on at least two occasions. On each occasion, Italiano told Bean that the money was from Dennis McGillicuddy, a principal of Coaxial Communications.

Ultimately, Coaxial Communications did not obtain the cable television franchise for the city of Tampa. Coaxial Communications, having obtained the franchise for the county of Hillsborough, sold that franchise and left the area.

## PROCEDURAL HISTORY

In May, 1985, a federal grand jury in the Middle District of Florida returned a forty-five count indictment charging twenty-five individuals and five corporations with racketeering, fraud, extortion, obstruction of justice, and several Travel Act offenses relating to a widespread bribery scheme within Hillsborough County, Florida. The grand jury charged appellant, Italiano, with a single count of mail fraud in violation of 18 U.S.C. § 1341.

On July 10, 1985, Italiano moved to dismiss the indictment on the ground that the mail fraud statute "was only intended to reach schemes that have as their goal an economic loss suffered by the victims and not an intangible right to good government." The district court, on December 10, 1985, denied that motion, along with all others which were pending. A jury found Italiano guilty of mail fraud, as charged in Count IV of the indictment. The district court sentenced him to two years confinement in the custody of the Attorney General.

## ISSUE

The sole issue in this appeal is whether the district court erred by denying Italiano's motion to dismiss the indictment on the ground that it failed to allege that the county or state was deprived of property or money by the alleged scheme.

## DISCUSSION

Italiano, relying upon the Supreme Court's recent pronouncement in *McNally v. United States*, 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) that the federal mail fraud statute is not implicated based on the intangible right of the citizenry to good government, argues that the district court erred by not dismissing the indictment. Italiano argues that the indictment charged that he violated the mail fraud statute, but did not charge that the state or county was deprived of any money or property as a result thereof.

In response, the government admits that the indictment does not charge a deprivation of money or property. It argues, however, that a state bribery violation is still actionable under the mail fraud statute,

even in light of *McNally,* if it is calculated to deprive its victim of money or property.

## A. The Indictment

"A grand jury indictment must set forth each essential element of an offense in order for a resulting conviction to stand." *United States v. Outler,* 659 F.2d 1306 (11th Cir.1981) (citing *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). This rule serves a twofold function. First, it comports with the sixth amendment requirement that each criminal defendant "be informed of the nature and cause of the accusation." Inclusion of the essential elements of the offense in an indictment will provide the accused with the minimal information necessary to satisfy this requirement. Second, and more relevant to the facts of this case, is that the fifth amendment right to an indictment for defendants charged with serious crimes is only furthered where the grand jury is able to properly perform its fact-finding function. As we stated in *Outler,* "[a] grand jury can perform its function of determining probable cause and returning a true bill only if all elements of the offense are contained in the indictment." *Outler,* 659 F.2d at 1310.

With this view in mind, we review Count IV of the indictment in which Italiano is charged with mail fraud in violation of 18 U.S.C. § 1341.[1] The essential elements of a mail fraud prosecution are (1) a scheme to defraud and (2) the use of the mails in execution or furtherance of that scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Sawyer,* 799 F.2d 1494, 1501–02 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987).

Prior to the Supreme Court's pronouncement in *McNally,* several circuit courts of appeals had affirmed mail fraud convictions under expansive interpretations of the mail fraud statute. One theory which emerged as a result of liberal interpretation of the mail fraud statute is the "intangible rights doctrine." This doctrine, based on the theory that citizens have a right to honest and impartial government, has historically served as a vehicle by which the government has sought mail fraud convictions against government officials. *See, e.g., United States v. Von Barta,* 635 F.2d 999, 1005–06 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Keane,* 522 F.2d 534 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. States,* 488 F.2d 761, 766 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

As explained by the Sixth Circuit in *United States v. Gray,* 790 F.2d 1290 (6th Cir.1986), *rev'd sub nom., McNally v. United States,* 483 U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), these cases

> are premised on an underlying theory that a public official acts as 'trustee for the citizens and the State ... and thus owes the normal fiduciary duties of a trustee, *e.g.,* honesty and loyalty' to the citizens and the State. The logic continues that, as the *cestui,* the public is entitled to the faithful and disinterested services of government servants and employees, and a public official may not deprive the public of its rights.

*Gray,* 790 F.2d at 1294 (quoting *United States v. Mandel,* 591 F.2d 1347, 1363 (4th Cir.), *aff'd in relevant part,* 602 F.2d 653 (4th Cir.1979) (in banc), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (citation omitted)).

*McNally* has emasculated the vitality of the intangible rights doctrine. In *McNally,* a public official of the Commonwealth of Kentucky and another person were indicted for engaging in a kickback scheme whereby the government official, acting on be-

---

1. The federal mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do [uses the mails or causes them to be used,] shall be fined not more than $1,000 or imprisoned not more than five years, or both.

half of the commonwealth, used his political influence to direct governmental insurance business to insurance companies in which the defendants had undisclosed financial interests. After a jury convicted the defendants on mail fraud and conspiracy counts and the court of appeals affirmed those convictions, the defendants appealed on the ground that the alleged kickback scheme was not cognizable under the federal mail fraud statute.[2]

The Supreme Court in *McNally* observed that the sparse legislative history underlying section 1341 "indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally*, 483 U.S. at ——, 107 S.Ct. at 2879, 97 L.Ed.2d at 300. Furthermore, the Court continued, *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), "the first case in which [the] Court construed the meaning of the phrase 'any scheme or artifice to defraud,' held that the phrase is to be interpreted broadly insofar as property rights are concerned, but did not indicate that the statute had a more extensive reach." *McNally*, 483 U.S. at ——, 107 S.Ct. at 2879, 97 L.Ed.2d at 300. Thus, the Court ultimately concluded that "[r]ather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure in good government for local and state officials, we read section 1341 as limited in scope to the protection of property rights." *McNally*, at ——, 107 S.Ct. at 2881, 97 L.Ed.2d at 302.

Having determined that the mail fraud statute was not intended to protect the intangible right of the citizenry to have public officials perform their duties honestly, the Court observed that nothing in the jury charge required the jury to find that the commonwealth was deprived of money or property. *McNally*, at ——, 107 S.Ct. at 2881, 97 L.Ed.2d at 302. Neither, the Court continued, was the jury charged "that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance" or that in order to convict, the jury "must find that the Commonwealth was deprived of control over how its money was spent." *McNally*, at ——, 107 S.Ct. at 2882, 97 L.Ed.2d at 302. Rather, as the Court understood the jury charge, it was sufficient for the jury to find that the defendants had breached a fiduciary duty of failing to disclose their conflicts of interest, thereby depriving the commonwealth of its right to a fair and honest government. Hence, finding that the jury instructions on the mail fraud count permitted a conviction for conduct not within the purview of the mail fraud statute, the Court reversed the convictions.[3] *McNally*, at ——, 107 S.Ct. at 2882, 97 L.Ed.2d at 303.

■ The indictment in this case is fatally flawed for the same reason that the jury

---

**2.** *United States v. Gray*, 790 F.2d 1290 (6th Cir. 1986), *rev'd sub nom. McNally v. United States*, 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

**3.** In light of *McNally*, the Supreme Court has also vacated judgments of conviction for mail fraud based on the intangible rights doctrine in *Holzer v. United States*, —— U.S. ——, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987), *vacating United States v. Holzer*, 816 F.2d 304 (7th Cir.1987) and *McMahan v. United States*, —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987), *vacating United States v. McMahan*, 788 F.2d 234 (4th Cir. 1986). In addition, various circuit courts of appeals have also overturned mail or wire fraud convictions which were predicated on the intangible rights doctrine. *See, e.g., United States v. Herron*, 825 F.2d 50 (5th Cir.1987) (reversing wire fraud convictions where jury was not required to find that defendants "defrauded the United States out of money or property"); *United States v. Cook*, 833 F.2d 109 (7th Cir.1987) (reversing judgment in part where mail and wire fraud convictions were premised upon "defrauding an official body of intangible rights" such as "loyal and faithful services"); *United States v. Gimbel*, 830 F.2d 621, 626 (7th Cir. 1987) (reversing mail and wire fraud convictions where indictment alleged that defendant devised a scheme to deprive the Treasury Department of "Currency Transaction Reports and other 'accurate and truthful information'"); *Sigmond v. Brown*, 828 F.2d 8, 9 (9th Cir.1987) (affirming summary judgment granted in favor of defendant where alleged predicate acts of mail fraud in plaintiff's RICO action "failed to present any plausible evidence that the defendants' conduct deprived [plaintiff] of any property or money").

instructions in *McNally* were infirm. Far more instructive than our mere statements applying *McNally*, however, are the revelations gained through a comparison of the jury instructions in *McNally* and the indictment in this case. Count III of the Italiano indictment alleges that Italiano, along with others,

> knowingly and willfully devised and intended to devise a scheme and artifice to defraud the citizens of Hillsborough County, and the citizens of the State of Florida generally of their right to the following:
>
> a. conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of official duties of the Board of County Commissioners, Hillsborough County, Florida; and
>
> b. to have the business of the Board of County Commissioners, Hillsborough County, Florida, and its affairs conducted honestly and impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments and in accordance with the laws of the State of Florida and Hillsborough County.

In *McNally*, the district court informed the jury of the charges in the indictment by instructing them that:

> Count 4 of the Indictment charges in part that the defendants devised a scheme or artifice to:
>
> (a.)(1.) defraud the citizens of the Commonwealth of Kentucky and its governmental departments, agencies, officials and employees of their right to have the Commonwealth's business and its affairs conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud; and
>
> (2.) obtain (directly and indirectly) money and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of facts.

> And for the purpose of executing the aforesaid scheme, the defendants, James E. Gray and Charles J. McNally, and Howard P. 'Sonny' Hunt, Jr., and others, did place and cause to be placed in a post office or authorized deposit for mail matter, matters and things to be sent and delivered by the Postal Service, and did take and receive and cause to be taken and received therefrom such matters and things and did knowingly cause to be delivered thereon and at the place at which it was directed to be delivered by the person to whom it was addressed, matters and things.

*McNally*, at —— —— n. 4, 107 S.Ct. at 2878 n. 4, 97 L.Ed.2d at 298–99 n. 4.

In attempting to distinguish this case from *McNally*, the government argues that a mail fraud prosecution having state bribery as a predicate is still viable in the aftermath of *McNally*. To buttress this claim, the government relies upon paragraph 2 of Count IV of the indictment which incorporates by reference paragraph fourteen of Count II.[4] Paragraph fourteen alleges that:

> 14. Between in or about January, 1980 and in or about December, 1980, Nelson Italiano and others, corruptly offered, promised and gave Charles Frank Bean III and ROBERT E. CURRY, public servants, and Charles Frank Bean III and ROBERT E. CURRY corruptly requested, solicited, agreed to accept and accepted, a benefit with an intent and purpose to influence an act which Nelson Italiano believed to be, and Charles Frank Bean III represented as being, within the official discretion of Charles Frank Bean III and ROBERT E. CURRY relating to Cable Television Franchise Agreement No. 80–563; chargeable under Florida Statutes, Sections 838.015 and an act of racketeering involving bribery as defined by Title 18, United States Code, Section 1961(1).

The government's argument is premised upon the validity of remarks by Justice Stevens in his dissenting opinion in *McNal-*

---

4. The government's argument must be considered in light of the fact that Italiano is not charged with bribery or any other offense in Count II.

*ly.* Justice Stevens in dissenting addressed the effect of *McNally*'s holding on cases involving intangible rights other than the general right of the citizenry to a fair and impartial government. Addressing, in particular, the effect of *McNally*'s holding on cases involving employee fraud, Justice Stevens wrote:

> When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for. Additionally, '[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds to the principal.' *Restatement (Second) of Agency*, § 403 (1958). This duty may fulfill the Court's 'money or property' requirement in most kickback schemes.

*McNally*, at —— n. 10, 107 S.Ct. at 2890 n. 10, 97 L.Ed.2d at 313 n. 10 (Stevens, J., dissenting). In a subsequent case, *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Supreme Court arguably embraced Justice Steven's remarks regarding employee fraud.

In *Carpenter*, Winans, the co-author of a Wall Street Journal column, which because of its perceived quality and integrity had the potential of affecting stock market prices, entered into a scheme with other individuals whereby they employed advance confidential information, such as the timing and contents of the column, to buy and sell in the market based upon the probable impact of the column. As a consequence of this scheme, Winans and others were indicted for having violated a variety of securities laws and mail and wire fraud laws. In finding the defendants guilty as charged, the district court found, and the court of appeals agreed, that Winans and others had fraudulently misappropriated "property," within the meaning of the mail and wire fraud statutes, by releasing the prepublication information.

In affirming the convictions for mail and wire fraud, the Supreme Court held that the scheme to appropriate the Wall Street Journal's confidential business information was a protected property right cognizable under the mail and wire fraud statutes, and its intangible nature did not render it any less so. *Carpenter*, —— U.S. at ——, 108 S.Ct. at 320. In so holding, the Court reasoned that "*McNally* did not limit the scope of 1341 to tangible as distinguished from intangible property rights." *Carpenter*, —— U.S. at ——, 108 S.Ct. at 320.

In refuting the claim that revealing prepublication information amounted to nothing more than a violation of work place rules rather than conduct proscribed by the mail fraud statute, the Court noted that the term "to defraud" as used in section 1341 must be interpreted according to its "common understanding." To this end, the Court recognized that " '[i]t is well established, as a general proposition, that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom.' " *Carpenter*, —— U.S. at ——, 108 S.Ct. at 321 (quoting *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497, 301 N.Y.S. 2d 78, 80, 248 N.E.2d 910, 912 (1969)).

Based on the foregoing language in *Carpenter*, in this case the government contends that a mail fraud prosecution having bribery, as defined by state law, as its predicate is still cognizable under the "money or property" requirement of *McNally*. Specifically, the government argues that the county commissioners, by accepting bribes from Italiano, breached their fiduciary relationship with the county; hence, they were accountable to the county government for any profits which were derived from the bribery transactions. Notwithstanding the Supreme Court's acknowledgement that an agent is generally liable to his principal for any profits derived where the agent exploits his fiduciary relationship for his own personal gain, we need not address the merits of this argument because it is irrelevant in this case. This is not the theory upon which the grand jury returned its indictment. In this case, the

grand jury stated what it found the citizenry was deprived of—good government.

The fifth amendment provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; . . . ." Although it is seldom that an indictment fails to fulfill its purpose—to inform the accused of the nature of the charges against him—it is well-recognized that another purpose is to be served by the requirement that an indictment set forth the essential elements of an offense. "This purpose, as defined in *United States v. Cruikshank*, 92 U.S. [2 Otto] 542, 558, 23 L.Ed. 588, 593 is 'to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.'" *Russell v. United States*, 369 U.S. 749, 768, 82 S.Ct. 1038, 1049, 8 L.Ed.2d 240 (1962) (quoting *United States v. Cruikshank*, 92 U.S. (2 Otto) 542, 558, 23 L.Ed. 588 (1876)). Viewed in this light, it is evident that the rule is designed not only for the protection of the defendant, "but for the benefit of the prosecution as well, by making it possible for courts called upon to pass on the validity of convictions under [a] statute to bring an enlightened judgment to that task." *Russell*, 369 U.S. at 769, 82 S.Ct. at 1050. Of even greater relevance here is that it would hinder our task in reviewing a conviction as well as serve as an affront to our criminal justice system to permit an accused to be subject to jeopardy based on facts which were not presented to nor found by the grand jury:

A grand jury, in order to make . . . [a] determination, must necessarily determine what the question under inquiry was. To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found

by, and perhaps not even presented to, the grand jury which indicted him.

*Russell*, 369 U.S. at 770, 82 S.Ct. at 1050; *accord Outler*, 659 F.2d at 1310.

For these reasons, we express no judgment as to the cogency of the government's argument that the mail fraud statute is violated when an employee uses the mails in furtherance of a scheme to accept unauthorized compensation. Having reviewed the indictment, it is obvious that the government did not present such facts, pursue this theory when presenting facts to the grand jury, or lead the grand jury ultimately to return its indictment on such a theory. Rather, as previously mentioned, the gravamen of the indictment is that the citizens of Hillsborough County were deprived of their right to have the affairs of the county "conducted honestly and impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments and in accordance with the laws of the State of Florida and Hillsborough County." The Supreme Court has held almost exact language insufficient for a mail fraud conviction.

The allegations in the indictment, even given a broad interpretation, are only susceptible of one interpretation: that the citizens of Hillsborough County were deprived of their intangible right to "good government." Accordingly, the government may not now seek to uphold Italiano's conviction on facts and theory different from that charged by the grand jury. We will not overlook the plain language of the indictment. As the Supreme Court admonished over a century ago: "If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by grand jury . . . [would] be frittered away until its value [was] almost destroyed. . . ." *Ex parte Bain*, 121 U.S.

1, 10, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1886).[5]

## B. Jury Instructions

We note also that the jury instructions served only to exacerbate, rather than ameliorate, the infirmities which permeated the indictment. In reviewing the sufficiency of jury instructions, we have previously said that our task is to "examine the entire charge to determine whether, taken as a whole, it adequately presented the issues and the law to the jurors." *United States v. Hewes*, 729 F.2d 1302, 1316 (11th Cir. 1984), *cert. denied sub nom. Caldwell v. United States*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). To this end, the district court must be granted wide latitude in wording the jury instructions "and will not be reversed so long as the charge correctly states the substance of the law." *Hewes*, 729 F.2d at 1316 (quoting *United States v. Sorrells*, 714 F.2d 1522, 1531 (11th Cir.1983)).

Turning to the jury instructions in this case, the district court instructed the jury as follows:

> In this case, as you know, the indictment charges the defendant in a single count, Count Four, with the commission of a mail fraud offense. Specifically it is alleged that the Defendant Nelson Italiano, together with Robert E. Curry and others, knowingly and willfully participated in a scheme to defraud the citizens of Hillsborough County and the citizens

of the state of Florida generally of their right to: A, the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performances of official duties of the Board of County Commissioners of Hillsborough, Florida; and, B, to have the business of the Board of County Commissioners, Hillsborough County, Florida, and its affairs, conducted honestly and impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments, in accordance with the laws of the state of Florida, and Hillsborough County.

So as not to belabor the point, we need only comment that the district court's jury instructions, which rely heavily on the intangible right of the citizenry to honest and fair government, are defective for the same reasons which the Court condemned the jury instructions given in *McNally*. The fact that the district court also instructed the jury that it must also find a violation of state bribery law as a predicate offense does not cure the insufficiency of the jury instructions.

## CONCLUSION

We emphasize that at the time the grand jury returned this indictment, several courts of appeals had held that public officials could be successfully prosecuted under the mail fraud statute for depriving

---

5. Although we express no view concerning the government's assertion that a bribery scheme, standing alone, is a sufficient basis upon which to sustain a conviction under the federal mail fraud statute, we note that at least one court of appeals has endorsed this view. *See United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987). In *Runnels*, the Sixth Circuit, after acknowledging that the intangible rights doctrine is no longer viable after *McNally*, launched what it called "an alternative rationale, based on the fraud that occurs when a fiduciary breaches his duty by appropriating an economic benefit that properly should be the principal's...." At 1186. In so concluding, the Sixth Circuit reasoned thusly:

> The existence of ... a bribe or kickback makes it unnecessary to invoke the intangible rights doctrine. The fiduciary's acquisition of an economic benefit which properly belongs to the principal, through an intentional

breach of a fiduciary duty owed to the principal, is in itself sufficient to support a finding of guilt under 18 U.S.C. § 1341.

> To understand why this is so, it is useful to consider the relevant elements of a conviction under section 1341 ...: (1) a scheme to (2) obtain by deceit (3) money or property. First, the agreement between the breaching fiduciary and the person paying him constitutes a scheme. Second, the breach itself provides the necessary deception. Third, the bribe or undue profit acquired through a breach of a fiduciary duty does not properly belong to the breaching fiduciary.

*Runnels*, at 1187 (footnotes and citations omitted). *See also United States v. Fagan*, 821 F.2d 1002, 1010–11 and n. 6 (5th Cir.1987) (affirming mail fraud convictions based, in part, on evidence that a corporation had been deprived of its property rights "to the kickbacks its employee Riley received from [the defendant]").

citizens of good government; unfortunately, the law changed after the return of this indictment. It is too late now for the government to claim that its indictment was returned by a grand jury cognizant of and acting in accordance with the new teachings of the Supreme Court.

We hold that the district court erred by denying Italiano's motion to dismiss the indictment where it failed to allege that either the county or state was defrauded of money or property by the alleged scheme. Accordingly, Italiano's conviction of mail fraud in violation of section 1341 is reversed and the judgment is vacated.

REVERSED and VACATED.

OWENS, Chief District Judge, dissenting:

Respectfully, I dissent.

Having been indicted in a convoluted, lengthy indictment on one count charging a violation of 18 U.S.C. §§ 1341 and 2, and having unsuccessfully moved the trial court to dismiss that count of the indictment for failure to allege an offense, appellant Nelson A. Italiano appeals his conviction, assigning as error only the trial judge's failure to grant his motion to dismiss that count of the indictment—Count Four.

The convoluted, lengthy Count Four of the indictment is set forth in its entirety as the Appendix. Appellant Italiano contends that Count Four—uncoiled, unwound and distilled to its essence—charges that he participated in and used the United States' mails in furtherance of a scheme to deprive the citizens of Hillsborough County, Florida, of their right to have the county's affairs conducted honestly by its county commissioners, an intangible right the deprivation of which the Supreme Court of the United States in *McNally v. United States*, 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), held is not criminalized by the mail fraud statute. Appellee the United States points out in response that by so contending, appellant Italiano focuses narrowly on the limited portion of Count Four which alleges a violation of the citizens of Hillsborough County's rights to good government, completely ignoring the lengthy remainder of the indictment which in essence charges appellant Italiano in violation of 18 U.S.C. §§ 1341 and 2 with having participated in a scheme and used the United States' mails to bribe publicly elected commissioners of Hillsborough County, Florida, to vote in favor of awarding a county cable television franchise to a particular entity, Coaxial Communication of the Suncoast, Inc. ("Coaxial"), conduct that according to *McNally* and the Supreme Court's recent decision of *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), is criminalized by the mail fraud statute.

FACTS:

This case began with an indictment issued on May 22, 1985. Count Four of that indictment charged Nelson Italiano with violations of 18 U.S.C. §§ 1341 and 2. Count Four specifically realleged and incorporated by reference "paragraphs one through three of Count Three" and "paragraph 14 of Count Two." In turn, paragraph one of Count Three specifically realleged and incorporated by reference "the Introduction of the Indictment." Paragraph three of Count Three likewise realleged and incorporated by reference "paragraphs 3 through 11 of Count One" of the indictment.

Aware of the risks both to brevity and to clarity inherent in reciting long passages from the indictment, the relevant paragraphs of the various counts will be synthesized where possible. However, in light of the Supreme Court's recent explanation of 18 U.S.C. § 1341 in *McNally*, a thorough examination of the indictment is imperative to determine the sufficiency of the indictment in the instant case.

The Introduction of the Indictment sets out the Board of County Commissioners as the chief legislative and policy-making Board for Hillsborough County, Florida. Included among the Board's described responsibilities was decision-making authority for the award of cable television franchise rights within the County. After briefly identifying the individuals and entities indicted, the indictment quoted certain

relevant statutes, one of which was Section 838.015 of the Florida Statutes. That section proscribes bribery, and it defines the offense as follows:

(1) "Bribery" means corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept for himself or another, any pecuniary or other benefit with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of a public servant, in violation of a public duty, or in performance of a public duty.

In paragraph two of Count Three, the indictment alleged that Nelson Italiano and others "knowingly and willfully devised and intended to devise a scheme and artifice to defraud the citizens of Hillsborough County" of, among other things, the right to have the business of the Board conducted free from fraud. The indictment outlined the substance of the scheme to defraud in Count One, paragraphs three through eleven. Those paragraphs essentially described a conspiracy in which certain individuals, by and through other individuals, gave certain benefits, including pecuniary benefits, to county commissioners with the purpose of influencing the commissioners' performance of certain discretionary acts, including acts which would benefit persons with an interest in "property."

Paragraph fourteen of Count Two alleged that Nelson Italiano gave a "benefit" to certain county commissioners "with an intent and purpose to influence an act ... within the official discretion of [those commissioners] relating to Cable Television Franchise Agreement No. 80–563 ...." Such conduct, the indictment alleged, was chargeable under Florida Statutes, Section 838.015, *supra.*

Finally, returning to Count Four, the indictment alleged that Nelson Italiano and others, "for the purpose of executing the aforesaid scheme and artifice to defraud ... knowingly caused to be placed in an authorized depository for mail ..." a letter in furtherance of that scheme. Such conduct, the government alleged, was in violation of 18 U.S.C. §§ 1341 and 2. Section 1341 as here applicable states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ..., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Discussion:

Recently, the Supreme Court has had occasion to comment upon prosecutions pursued under the mail fraud statute. In *McNally, supra,* the Supreme Court stated that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *McNally,* 483 U.S. at ——, 107 S.Ct. at 2879, 97 L.Ed.2d at 299–300. The Court chose to read section 1341 "as limited in scope to the protection of property rights" rather than "in a manner that leaves its outer boundaries ambiguous...." *Id.* at ——, 107 S.Ct. at 2881, 97 L.Ed.2d at 302. The Supreme Court explained that the mail fraud statute, which criminalizes "schemes or artifices 'to defraud' or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ...," [1] should not be read as establishing two types of schemes—the latter involving the deprivation of money or property and the former not involving such a deprivation. "To defraud" generally refers " 'to wronging one

---

1. *McNally,* 483 U.S. at ——, 107 S.Ct. at 2880, 97 L.Ed.2d at 301.

in his property rights by dishonest methods or schemes' and 'usually [signifies] the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* at ——, 107 S.Ct. at 2880–81, 97 L.Ed.2d at 301, quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). Therefore, "[a]ny benefit which the Government derives from [section 1341] must be limited to the Government's interests as property holder." *Id.* 483 U.S. at —— n. 8, 107 S.Ct. at 2881 n. 8, 97 L.Ed.2d 301–02, n. 8. However, the Court stated that the phrase "property rights" should be interpreted broadly. *Id.* at ——, 107 S.Ct. at 2879–80, 97 L.Ed.2d at 300.

In reversing appellants' convictions, the Court in *McNally* found the jury charges insufficient because "the jury was not required to find that the [victim] was defrauded of any money or property." *Id.* at ——, 107 S.Ct. at 2882, 97 L.Ed.2d at 302. The Court continued:

> It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the premium for insurance would have been paid to some agency, and what Hunt and Gray did was to assert control that the Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent. (footnote omitted).

*Id.*

In footnote 9, the Supreme Court expanded upon the ideas contained within the above quote. The Court stated that it should assume, because it was not alleged, that the actions of the principals in *McNally* did not violate state law. The Court noted that the "violation asserted is the failure to disclose their financial interest, even if state law did not require it, to other parties in the state government whose ac-

tions could have been affected by the disclosure." *Id.* at —— n. 9, 107 S.Ct. at 2882 n. 9, 97 L.Ed.2d at 303 n. 9. Commenting upon Congress' power to criminalize the efforts of a state official to profit from governmental decisions in the absence of state law to the contrary, the Court said that "it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such an interest defrauds the state and is forbidden under federal law." *Id.* Implicit within this discussion lies the concept that the mail fraud statute does encompass a scheme involving the deprivation of money or property in violation of state law.

In a subsequent opinion, the Court explained *McNally* and said that section 1341 reaches "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, —— U.S. ——, ——, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987). In *Carpenter*, the Court acted upon its articulated position that property rights are to be interpreted broadly. The object of the scheme in *Carpenter* was "to take the [Wall Street] Journal's confidential business information...." *Carpenter*, —— U.S. at ——, 108 S.Ct. at 320. The Court found that "[c]onfidential business information has long been recognized as property." *Id.* [citations omitted].

In this case it must first be determined whether the indictment sufficiently alleged that Italiano participated in a scheme to deprive another of money or property by means of false of fraudulent pretenses, representations, or promises. If the indictment is sufficient in this respect, the next consideration becomes whether the inclusion of the "good government" allegation in the indictment somehow prejudiced appellant.

Once again, the narrow grounds of this appeal must be noted. Appellant attacks only the sufficiency of the indictment. He attacks neither the sufficiency of the evidence nor the trial judge's instructions to

the jury.[2] The sufficiency of an indictment is measured in accordance with the Sixth Amendment guarantee that a defendant be informed of the government's accusations against him. *See Russell v. United States,* 369 U.S. 749, 761, 82 S.Ct. 1038, 1045, 8 L.Ed.2d 240 (1962). "In general, an indictment need contain only those facts and elements of the alleged offense necessary to sufficiently inform the accused of the charge and to safeguard the accused from double jeopardy." *United States v. Gold,* 743 F.2d 800, 812 (11th Cir.1984), citing *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620–21 (1974). While it is axiomatic that an indictment must contain every element of the offense charged, the law does not compel that the indictment track the statutory language. *United States v. Stefan,* 784 F.2d 1093, 1101 (11th Cir.1986). "[W]hen the indictment specifically refers to the statute on which the charge was based, the statutory language may be used to determine whether the defendant received adequate notice." *United States v. Chilcote,* 724 F.2d 1498, 1505 (11th Cir.1984), cited with approval in *Stefan,* 784 F.2d at 1101–02.

In *Chilcote,* this court stated that the "slight variation between the language of the indictment and the statute itself is cured by the indictment's reference to the statute." *Chilcote,* 724 F.2d at 1505. In *Stefan,* the indictment likewise specifically referred to the statute, and the court said that "Stefan cannot claim that he did not receive adequate notice of the charges against him." *Stefan,* 784 F.2d at 1102. "[P]ractical, rather than technical considerations govern the validity of an indictment." *Id.; see Chilcote,* 724 F.2d at 1505.

Though the variations between statute and indictment were "slight" in the above-discussed cases, this court has affirmed convictions where a greater variation has appeared. *See United States v. Mullens,* 583 F.2d 134 (5th Cir.1978).[3] In *Mullens* the Fifth Circuit acknowledged that the statute itself (21 U.S.C. § 662) failed to include an element of the offense. "[A] more difficult problem is created by the absence of language in the statute requiring the receipt of a thing of value to be in connection with the performance of official duties." *Mullens,* 583 F.2d at 140–41. The court considered a First Circuit opinion in which that court engrafted the missing requirement upon the statute. *See United States v. Seuss,* 474 F.2d 385 (1st Cir.1973), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). Legislative history and administrative interpretation supported the First Circuit's stance in that case. The Fifth Circuit likewise adopted the judicially created element. Then, the Fifth Circuit examined the indictment. Though the indictment did not contain language identical to the *Seuss* formulation, the court found that it contained sufficient facts to establish the required element. "Unless we attach some talismanic significance to the precise language of *Seuss,* the indictment is sufficient." *Mullens,* 583 F.2d at 141.

The above-discussed standards and analyses properly may be applied to the present case. The indictment must be examined as a whole, and it need not recite certain "magic words." In Count Four, the government specifically charged Italiano with a mailing in conjunction with a scheme or artifice to defraud, in violation of "Title 18, United States Code, Sections 1341 and 2." This specific reference to section 1341 permits the court to examine the statutory language to determine whether appellant received adequate notice of the charge against him. *See Chilcote* and *Stefan, supra.* As previously quoted, the statute provides ample notice that one may not

---

**2.** Given the post-*McNally* state of the law, the jury instructions in this case may have been erroneous. However, the Third Circuit recently affirmed a mail fraud conviction despite jury instructions heavily laced with language disapproved of in *McNally.* The court said that given the totality of the circumstances, the jury could not have convicted the appellant unless it found that an object of the scheme in which he partici-

pated was to obtain money from a particular entity. *See United States v. Piccolo,* 835 F.2d 517 (3rd Cir.1987).

**3.** This court adopted all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981. *See Bonner v. Prichard,* 661 F.2d 1206 (11th Cir.1981).

participate in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1341. The *McNally* opinion makes clear that the statute is not to be read in the disjunctive. *See* Discussion, *supra.* The indictment then, through the incorporation of the statute, informs Italiano that he was charged with using the United States' mails in furtherance of a scheme "to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter,* — U.S. at ——, 108 S.Ct. at 321. However, in light of the recent upheaval in the law pursuant to the *McNally* opinion, scrutiny beyond this specific reference is necessary to make certain of the sufficiency of this indictment.

Though each count of an indictment is generally considered as if it were a separate indictment, *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 359, "[a]llegations made in one count may be incorporated by reference in other counts." 1 Wright, Federal Practice and Procedure: Criminal 2d § 123; *United States v. Kilroy,* 523 F.Supp. 206, 210 (E.D. Wis.1981). However, such incorporation by reference must be done expressly. *Davis v. United States,* 357 F.2d 438 (5th Cir. 1966). Assuming *arguendo* that the reference in the indictment to section 1341 does not suffice, the requisite specificity is accomplished by realleging and incorporating by reference the relevant counts and paragraphs of the indictment.

In light of *McNally* and *Carpenter,* the elements of the crime of mail fraud include (1) the existence of a scheme to defraud some victim[s] of money or property, and (2) the use of the mails in furtherance of the scheme. *Accord United States v. Gimbel,* 830 F.2d 621, 626 (7th Cir.1987). A plain reading of this indictment would have informed appellant that he had been charged with using the United States' mails in furtherance of a scheme to bribe county commissioners to award a cable television franchise to Coaxial based not on the competitiveness of that company's bid but rather upon Coaxial's bribe.

Congress has enacted legislation to "establish a national policy concerning cable communications." *See* 47 U.S.C. § 521, *et seq.* Among other purposes identified in section 521 are both the establishment of franchise procedures and standards and the establishment of guidelines for the exercise of Federal, State and local authority with respect to the regulation of cable systems. Section 522 defines a franchise as "an initial authorization, or renewal thereof ..., issued by a franchising authority [a governmental entity], ... which authorizes the construction or operation of a cable system...." 47 U.S.C. § 522(8). Pursuant to this legislation, courts have held that local franchising processes are an acceptable means of regulating the cable television industry. *See e.g. Tribune–United Cable v. Montgomery County,* 784 F.2d 1227 (4th Cir.1986); *Rollins Cablevue, Inc. v. Saienni Enterprises,* 633 F.Supp. 1315 (D.Del, 1986); *Central Telecommunications v. TCI Cablevision,* 610 F.Supp. 891 (W.D.Mo. 1985). An additional objective of the legislation is the establishment of "an orderly process for franchise renewal which protects cable operators against unfair denials of renewal...." 47 U.S.C. § 521(5). Both the use of the term "franchise" and the specifically provided for protection against arbitrary denial or revocation of such clearly bring cable television franchises within the common law concept of a "franchise."

"Franchises are *property* and are frequently invested with the attributes of property generally." 37 C.J.S. Franchises § 8 (1943) (emphasis added). The term "franchise" has been used to refer to "a grant by the state to some person, natural or corporate, of some privilege or power, not common to the people generally, with respect to property or rights subject to the control of the state or of some agency of the state." 37 C.J.S. Franchises § 5 (1943).

Importantly, Florida regards franchises as property. "A franchise owes its existence to a contract between the sovereign power and the grantee. Nevertheless, it is regarded by the law as property within the meaning of the Constitution...." 27 Fla.

Jur.2d Franchises From Government § 2 (1981) and cases cited therein.

Clearly the cable television franchise held by the County of Hillsborough for the people of that county to be awarded to some commercial entity is "property," and the attempt by appellant to defeat the competitive bidding process and to secure the cable television franchise by bribery is a scheme to deprive the county and its people of that property. Therefore, even assuming that the indictment's specific reference to the statute was not sufficient notice, the specifically incorporated counts and paragraphs provide the specificity required to ensure the sufficiency of the indictment.

The instant case is distinguishable from *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987), in which "the 'scheme' consisted of depriving the Treasury Department of Currency Transaction Reports and other 'accurate and truthful information and data.'" *Id.* at 626. *Gimbel*, like *McNally*, involved the failure of individuals to provide information to government officials whose actions might have been affected by the disclosure. *Id.* at 627.[4] The *Gimbel* indictment, then, alleged not that the defendant defrauded the government of money or property but rather that he failed to provide information to the government. In the case presently under consideration, appellant Italiano utilized the United States' mails to defraud the government of a franchise, *i.e.*, property. Such conduct is prohibited by section 1341.

Finally, the indictment incorporated by reference the Florida bribery statutes,[5] thus clearly noticing appellant that he was charged with bribing public officials in connection with official acts. An allegation charging a violation of state law, a fatal omission identified by the Supreme Court in *McNally*, is thus conspicuously included in the indictment before this court. Further, the violations defined in those statutes inherently involve the deprivation of

money or property. Fiduciaries have no right to economic benefits acquired through the breach of their fiduciary duties. "[T]he benefit properly belongs to the entity to whom the fiduciary has a duty." *United States v. Runnels*, 833 F.2d 1183, 1187 (6th Cir.1987). Justice Stevens pointed out in *McNally* that "prosecutions of corrupt officials who use the mails to further their schemes may continue since it will frequently be possible to prove some loss of money or property." *McNally*, 483 U.S. at ——, 107 S.Ct. at 2890, 97 L.Ed.2d at 313 (Stevens, J., dissenting). Such loss of money or property can be found where an agent (a public official) accepts bribes or kickbacks as a result of a violation of his fiduciary duty to his principal. *Id.* at ——, n. 10, 107 S.Ct. at 2890 n. 10, 97 L.Ed.2d at 313 n. 10 (Stevens, J., dissenting).

The acceptance by the county commissioners of Italiano's bribe constitutes such a breach of the commissioners' fiduciary duty to their principal—the county and the public. It follows, then, that the commissioners are required to account to their principal for the money that they received. *See United States v. Carter*, 217 U.S. 286, 306, 30 S.Ct. 515, 520, 54 L.Ed. 769 (1910). Appellant Italiano, then, aided and abetted certain county commissioners in the violation of their fiduciary duty. *See* 18 U.S.C. § 2. The bribe paid to the commissioners rightly belonged to the county. By failing to account to the county, the commissioners, and hence Italiano, deprived the county of money.

This case is therefore not at all like the situation presented in *McNally*. The Supreme Court specifically pointed out that the actions of the principals in *McNally* were not a violation of state law. That being the case, the commissions paid to the individuals in *McNally* were not funds belonging to or controlled by the state. In the instant case, the corrupt county com-

---

4. The *Gimbel* court states that the Supreme Court found the indictment in McNally deficient. In reality, the Court held the jury instructions improper. "We hold, therefore, that the jury instruction on the substantive mail fraud

count permitted a conviction for conduct not within the reach of § 1341." *McNally*, 483 U.S. at ——, 107 S.Ct. at 2882, 97 L.Ed.2d at 303.

5. *See* Appendix.

missioners, and therefore Italiano, appropriated money in the form of the bribes that properly belonged to the county. The relevant Florida statutes expressly forbade such appropriation. These statutes, in concert with the fiduciary duty doctrine, clearly establish that both the county and the public were deprived of "money," and Count Four of the indictment, which incorporated by reference the bribery statute and specifically alleged a violation of 18 U.S.C. § 2, sufficiently notices appellant of such an allegation.

For all of the above reasons, the indictment in this case is constitutionally sufficient both to inform appellant of the charge against him and to enable him to plead an acquittal or conviction in bar of future prosecutions. *See United States v. Goodman*, 605 F.2d 870, 885 (5th Cir.1979); *United States v. Varkonyi*, 645 F.2d 453, 456 (5th Cir. Unit A 1981). Therefore, the question becomes whether appellant was somehow prejudiced by the inclusion in the indictment of the now improper "intangible rights to good government" allegations.

A defendant's "right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crimes." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985). Striking allegations from an indictment to narrow the scope of the scheme alleged is permitted." *United States v. Lee*, 667 F.Supp. 1404, 1417 (D.Colo.1987), citing *Miller*, 471 U.S. at 136, 105 S.Ct. at 1815. In *Lee*, a post-*McNally* case, the court struck allegations relating to the intangible rights theory.

Clearly, the essence of the scheme to defraud the public of its right to "good government" consisted of the scheme to procure the cable television franchise by fraudulent means. In exorcising the "good government" language from the indictment, this court would merely remove the gloss while leaving intact the essential elements of the crime. Thus, it could not be said that appellant was prejudiced by the inclusion of the "good government" allega-

tions, and those allegations may be stricken without negating the conviction.

The trial court properly failed to grant appellant's motion to dismiss the indictment. I would affirm the appellant's conviction.

## APPENDIX

### COUNT FOUR

1. The Grand Jury realleges and incorporates by reference paragraphs one through three of Count THREE of this Indictment.

### (COUNT THREE)

■ The Grand Jury realleges and incorporates by reference the INTRODUCTION of this Indictment.

### (INTRODUCTION)

■ At all times material to this indictment,

(1) The Board of County Commissioners of Hillsborough County, Florida served as the chief legislative and policy making board for Hillsborough County (a non-charter county), as established by the Constitution and the statutes of the State of Florida.

(2) As the chief legislative and policy making body for Hillsborough County, the Board of County Commissioners, among other responsibilities, served as the final authority on zoning, applications for alcoholic beverage hearings (so-called wet-zoning), borrow pit permits, cable television franchise agreements, road paving contracts, waste resource recovery projects, waste hauling franchise agreements, garbage rate increases and waste disposal sites and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), the activities of which affected interstate commerce.

(3) The Hillsborough County Board of County Commissioners was composed of five (5) commissioners, at any one time, each representing a geographical district in Hillsborough County and elected, in general elections, to four-year terms.

(4) ROBERT E. CURRY was a Hillsborough County Commissioner representing

District No. 1 from in or about November, 1972 through in or about November, 1980.

(5) FRED ARTHUR ANDERSON was a Hillsborough County Commissioner representing District No. 1 from in or about November, 1980, until in or about February, 1983.

(6) Robert Bondi was a Hillsborough County Commissioner representing District No. 2 from in or about November, 1974 until in or about November, 1978.

(7) Jan Platt was a Hillsborough County Commissioner representing District No. 2 having taken office in or about November, 1978.

(8) Joel Koford was a Hillsborough County Commissioner representing District No. 3 from in or about October, 1976 until in or about March, 1978.

(9) Charles Frank Bean, III, was a Hillsborough County Commissioner representing District No. 3 from in or about April 1, 1978, until in or about November, 1980.

(1) JOSEPH HENRY KOTVAS, JR., was a Hillsborough County Commissioner representing District No. 3 from in or about November, 1980, until in or about February, 1983.

(11) Francis H. Davin was a Hillsborough County Commissioner representing District No. 4 from in or about November, 1974 until in or about November, 1982.

(12) Rodney Colson was a Hillsborough County Commissioner representing District No. 4 having taken office in November, 1982.

(13) Robert Lester was a Hillsborough County Commissioner representing District No. 5 until in or about November, 1976.

(14) Jerry Merle Bowmer was a Hillsborough County Commissioner representing District No. 5 from on or about November 16, 1976, until in or about February, 1983.

(15) Andrew Argintar was a Zoning Hearing Officer for the Board of County Commissioners of Hillsborough County, Florida.

(16) ROBERT A. CANNELLA was an attorney, licensed to practice law in the State of Florida.

(17) JOHN DAVID DEMMI was an attorney, licensed to practice law in the State of Florida.

(18) LAURENCE I. GOODRICH was an attorney, licensed to practice law in the State of Florida.

(19) PAUL B. JOHNSON was an attorney, licensed to practice law in the State of Florida.

(20) MICHAEL SIERRA was an attorney, licensed to practice law in the State of Florida.

(21) JOSEPH HENRY ANDERSON, JR. was President and a Director of ANDERSON CONTRACTING COMPANY, INC., a Florida corporation engaged in the business of general contracting, and was Vice–President of COLUMBIA PAVING, INC., a Florida corporation engaged in the business of road construction.

(22) LOIS BAILEY was a resident of College Park, Georgia.

(23) JOHN DeCARLUCCI was a resident of Hillsborough County, and was President and Director of John Dee Construction Company, Inc., a Florida corporation engaged in the business of contracting.

(24) MARCELLINO ECHEVARRIA, also known as MARCELO ECHEVARRIA, was a resident of Hillsborough County, and was owner and President of SCAN REALTY SERVICES, INC., a Florida Corporation engaged in the business of brokering real estate transactions.

(25) MANUEL FERNANDEZ was a resident of Hillsborough County and did business as contractor in the State of Florida.

(26) RONNIE D. FULLWOOD was a resident of Hillsborough County and was the owner and President of Fulwood Farms, Inc., a Florida corporation engaged in the business of commercial farming.

(27) LEROY R. GONZALEZ, JR. was a resident of Hillsborough County and did business as a seller of automobile tires under the name of Bay Area Tire and Service Center.

(28) RICHARD D. GUAGLIARDO was a resident of Hillsborough County and did business as a supplier of fuel oil in the name of RICHARD'S FUELS.

(29) NELSON ITALIANO was a resident of Hillsborough County and President of Baldwin–Italiano, Inc., a Florida corporation, engaged in the insurance business.

(30) MICHAEL T. NOVAK was a resident of Hillsborough County and was President of Noport Investments, Inc., a Florida corporation engaged in the business of real estate development.

(31) ALEXANDER G. RAPPAPORT, also known as SANDY RAPPAPORT, was a resident of Hillsborough County and the Vice–President of Noport Investments, Inc.

(32) CESAR AUGUSTUS RODRIGUEZ was a resident of Hillsborough County.

(33) LOUIS ROCHA was a resident of Hillsborough County, and did business as a real estate developer.

(34) HAROLD L. ROSSITER, also known as HAP ROSSITER, hereinafter sometimes referred to as HAROLD L. "HAP" ROSSITER, was a resident of Hillsborough County, President of Environmental Housing, Inc., a Florida corporation engaged in the housing construction business and at times material herein did business, or attempted to do business under the fictitious trade name of Technical Assistance Consulting Service.

(35) CLAUDE TANNER was a resident of Hillsborough County and President of SUBURBAN DISPOSAL SERVICE, INC., a Florida corporation engaged in the waste disposal business in Hillsborough County.

(36) EUGENE THOMASON was a resident of Hillsborough County, doing business as Gene's Country Kitchen.

(37) CULLEN H. WILLIAMS, also known as BUSTER WILLIAMS, hereinafter sometimes referred to as CULLEN H. "BUSTER" WILLIAMS, was a resident of Hillsborough County, and President of ALAFIA LAND DEVELOPMENT CORPORATION, INC., a Florida Corporation.

■ At all times material herein, Florida Statute § 838.015 provided:

(1) "Bribery" means corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept for himself or another, any pecuniary or other benefit with an intent or purpose to influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of a public servant, in violation of a public duty, or in performance of a public duty.

(2) Prosecution under this section shall not require any allegation or proof that the public servant ultimately sought to be unlawfully influenced was qualified to act in the desired way, that he had assumed office, that the matter was properly pending before him or might by law properly be brought before him, that he possessed jurisdiction over the matter, or that his official action was necessary to achieve the person's purpose.

(3) Any person who commits bribery is guilty of a felony in the third degree, punishable as provided in § 775.082, § 775.083, or § 775.084.

■ At all times material herein, Florida Statute § 838.016 provided:

(1) It is unlawful for any person corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept, any pecuniary or other benefit not authorized by law, for the past, present, or future performance, nonperformance, or violation of any act or omission which the person believes to have been, or the public servant represents as having been, either within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty. Nothing herein shall be construed to preclude a public servant from accepting rewards for services performed in apprehending any criminal.

\* \* \* \* \* \*

(3) Prosecution under this section shall not require that the exercise of influence or official discretion, or violation of a public duty or performance of a public duty, for which a pecuniary or other benefit was given, offered, promised, requested, or solicited was accomplished or was within the influence, official discretion, or public duty of the public servant whose action or omission was sought to be rewarded or compensated.

(4) Whoever violates the provisions of this section shall be guilty of a felony of the third degree, punishable as provided in § 775.082, § 775.083, or § 775.084.

■ At times material herein, Florida Statute § 112.3143 required disclosure of the nature of any personal, private or professional interest a public officer had which inured to his special private gain within 15 days after the vote occurred.

■ At times material herein Florida Statute § 112.3145 required disclosure of financial interests of local officers including all sources of income in excess of 5 percent of his gross income except a business partners' sources of income; and a list of all persons, business entities or other organizations from whom he received certain gifts in excess of $100.00 in value.

■ At times material herein Florida laws regulating Campaign Financing provided, in pertinent part:

Florida Statute 106.07 Reports; certification and filing.—

(1) Each campaign treasurer designated by a candidate or political committee pursuant to s. 106.021 shall file regular reports of all contributions received, all all (sic) expenditures made, by or on behalf of such candidate or political committee.

\* \* \* \* \* \*

Florida Statute 106.08 Contributions; limitations on.—

(1) No person or political committee shall make contributions to any candidate or political committee in this state, for any election, in excess of the following amounts:

(a) To a candidate for countywide office or to a candidate in any election conducted on less than a county wide basis, $1,000.

\* \* \* \* \* \*

Florida Statute 106.09 Cash contributions and contribution by cashier's checks.—

(1) No person shall make or accept a cash contribution or contribution by means of a cashier's check in excess of $100.

[2.] From in or about November 1976, and continuously thereafter up to the date of this Indictment, in the Middle District of Florida, and elsewhere,

FRED ARTHUR ANDERSON,

JOSEPH HENRY ANDERSON, JR.,

ANDERSON CONTRACTING COMPANY, INC.,

COLUMBIA PAVING, INC.,

LOIS BAILEY,

ROBERT A. CANNELLA,

ROBERT E. CURRY,

JOHN DeCARLUCCI,

JOHN DAVID DEMMI,

MARCELLINO ECHEVARRIA,

a/k/a Marcello Echevarria,

MANUEL FERNANDEZ,

LEROY R. GONZALEZ, JR.

LAURENCE I. GOODRICH,

RICHARD D. GUAGLIARDO,

NELSON ITALIANO,

PAUL B. JOHNSON,

JOSEPH HENRY KOTVAS, JR.,

MICHAEL T. NOVAK,

ALEXANDER G. RAPPAPORT,

a/k/a Sandy Rappaport,

LOUIS ROCHA,

CESAR AUGUSTUS RODRIGUEZ,

HAROLD LEONARD ROSSITER,

a/k/a Hap Rossiter,

MICHAEL SIERRA,

CLAUDE TANNER,

EUGENE THOMASON,

and

CULLEN H. WILLIAMS,

a/k/a Buster Williams,

and others who are both known and unknown to the Grand Jury, knowingly and

 willfully devised and intended to devise a scheme and artifice to defraud the citizens of Hillsborough County, and the citizens of the State of Florida generally of their right to the following:

a) conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of official duties of the Board of County Commissioners, Hillsborough County, Florida; and

b) to have the business of the Board of County Commissioners, Hillsborough County, Florida, and its affairs conducted honestly and impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments and in accordance with the laws of the State of Florida and Hillsborough County.

 The substance of which scheme to defraud and its manner and means are set forth in paragraphs 3 through 11 of Count One of this Indictment and the grand jury realleges and incorporates by reference those paragraphs as though fully set forth herein.

### The Manner and Means of the Conspiracy

#### A. In General

(3.) It was part of the conspiracy that the defendants and others would directly and indirectly offer, promise, give, solicit, request, agree to accept and accept benefits, including pecuniary benefits, some pecuniary benefits disguised as cash campaign contributions to influence the performance of an act or for the past, present or future performance of an act within the official discretion of members of the Board of County Commissioners of Hillsborough County, Florida and to insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy.

(4.) It was further a part of the conspiracy that defendants and others would introduce, refer or otherwise bring to the attention of each other, individuals, including themselves, willing to influence the performance of an act within the official discretion of Hillsborough County Commissioners by paying bribes directly, or indirectly through fees or other charges, and to insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy.

(5.) It was further a part of the conspiracy that defendants and others would give Hillsborough County Commissioners benefits, including pecuniary benefits, some pecuniary benefits disguised as cash campaign contributions, free repairs, free vacation accommodations, meals, and other benefits to maintain general influence over the performance of acts within the official discretion of Hillsborough County Commissioners, and to promote, foster, further, facilitate and enlarge the conspiracy.

(6.) It was further a part of the conspiracy that defendants and others would perform acts designed to insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy, including monitoring the progress of allegations which might expose portions of the enterprise or its racketeering activity, or generate political harm to corrupt Hillsborough County Commissioners, that had been referred to the Hillsborough County, Florida State Attorneys Office.

(7.) It was further a part of the conspiracy that defendants and others would use, fail to use, or manipulate the rules, regulations, ordinances or procedures of the Hillsborough County Board of County Commissioners to insulate, protect, promote, foster, further, facilitate and enlarge the direct and indirect offering, promising, giving, soliciting, requesting, agreeing to accept and acceptance of benefits, including pecuniary benefits.

(8.) It was further a part of the conspiracy that defendants and others would obtain, or attempt to obtain, a corrupt majority of the members of the Board of County Commissioners of Hillsborough County, by means which included:

(a) supporting the election or reelection of corrupt Hillsborough County Board of County Commissioners; (b) causing or attempting to cause, corrupt candidates for the Board of County Commissioners of Hillsborough County, to run against non-corrupt candidates for the Board of

County Commissioners of Hillsborough County;

(c) discouraging, discrediting and impairing the ability of non-corrupt Hillsborough County Board of County Commissioners to perform their public duties; or

(d) recruiting Hillsborough County Board of County Commissioners into the conspiracy.

(6.) It was further a part of the conspiracy that defendants and others would perform acts designed to insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy, including monitoring the progress of allegations which might expose portions of the enterprise or its racketeering activity, or generate political harm to corrupt Hillsborough County Commissioners, that had been referred to the Hillsborough County, Florida State Attorneys Office.

(7.) It was further a part of the conspiracy that defendants and others would use, fail to use, or manipulate the rules, regulations, ordinances or procedures of the Hillsborough County Board of County Commissioners to insulate, protect, promote, foster, further, facilitate and enlarge the direct and indirect offering, promising, giving, soliciting, requesting, agreeing to accept and acceptance of benefits, including pecuniary benefits.

(8.) It was further a part of the conspiracy that defendants and others would obtain, or attempt to obtain, a corrupt majority of the members of the Board of County Commissioners of Hillsborough County, by means which included:

(a) supporting the election or reelection of corrupt Hillsborough County Commissioners;

(b) causing or attempting to cause, corrupt candidates for the Board of County Commissioners of Hillsborough County, to run against non-corrupt candidates for the Board of County Commissioners of Hillsborough County;

(c) discouraging, discrediting and impairing the ability of non-corrupt Hillsborough County Board of County Commissioners to perform their public duties; or

(d) recruiting Hillsborough County Board of County Commissioners into the conspiracy.

(9.) It was further a part of the conspiracy that defendants and others would and did perform acts for the purpose of acquiring, maintaining, protecting and concealing interests, profits and proceeds derived from the giving of benefits, including pecuniary benefits as described in the above paragraphs.

(10.) It was further a part of the conspiracy that defendants would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, the objectives of and acts done in furtherance of the conspiracy including engaging in obstruction of justice and criminal investigations.

B. *Roles of the Defendants*

(11.) It was further a part of the conspiracy that defendants played one or more of the following roles, among others, in furthering the affairs of the enterprise:

a. Corrupt Hillsborough County Commissioners who:

(1) would and did represent, and would cause, use and authorize others to represent, that they had control and/or influence over the disposition of acts within the official discretion of the Board of County Commissioners of Hillsborough County;

(2) would and did solicit, request, agree to accept and accept, and would and did cause, use and authorize other defendants, and others, to solicit, request, agree to accept and accept benefits, including pecuniary benefits, for themselves and others because of their influence over acts within the official discretion of the Board of County Commissioners of Hillsborough County;

(3) would and did exercise their discretion over acts within their official discretion to promote and facilitate the giving of benefits, including pecuniary benefits which were given with an intent and purpose to obtain specific or general influence over acts within their official discretion.

(4) would act as a conduit to other Hillsborough County Commissioners, for bene-

fits, including pecuniary benefits, to influence acts, or for the past, present or future performance of acts within their official discretion;

(5) would and did refer or introduce individuals to others, and would and did accept referral or introduction of individuals from others, with an intent and purpose of soliciting, requesting, agreeing to accept and accepting benefits, including pecuniary benefits, to influence acts within their official discretion and to insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy;

(6) would use or manipulate, among themselves, or together with others the rules, regulations, procedures or ordinances of the Board of County Commissioners of Hillsborough County to insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy;

(7) would, themselves or together with others insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy.

(b) Brokers, middlemen, or insulators who would do, and did perform one or more of the following:

(1) would represent that they had the ability to control and/or influence the disposition of matters, petitions, applications and other discretionary actions of the Board of County Commissioners of Hillsborough County;

(2) would and did offer, promise, give, solicit, request, agree to accept and accept benefits, including pecuniary benefits, with intent and purpose to influence discretionary acts of the Board of County Commissioners of Hillsborough County Commissioners of Hillsborough County for the purpose of receiving a benefit for themselves or others;

(3) would make and accept referrals and introductions of individuals with an interest and purpose of offering, promising, giving, soliciting, requesting, agreeing to accept and accepting benefits, including pecuniary benefits, to influence acts within the official discretion of the Board of County Commissioners of Hillsborough County and to

insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy;

(4) would use or manipulate, together with others, the rules, regulations, procedures or ordinances of the Board of County Commissioners of Hillsborough County;

(5) would, themselves or together with others insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy.

c. Source bribe payors, who would and did perform one or more of the following:

(1) would locate, seek, contract for, possess or have an interest which would benefit from influencing acts within the official discretion of the Board of County Commissioners of Hillsborough County, in real estate, businesses or other property which were, or which could be brought within the official discretion of the Board of County Commissioners for Hillsborough County;

(2) would petition, request, apply for, bid or propose upon, or otherwise have an interest in petitions, applications or other matters or actions which were within the official discretion of the Board of County Commissioners for Hillsborough County;

(3) would seek, and accept, introduction and referral to corrupt Hillsborough County Commissioners and others, with an intent and purpose to offer, promise and give benefits, including pecuniary benefits to influence acts within the official discretion of corrupt Hillsborough County Commissioners;

(4) would offer, promise and give benefits, including pecuniary benefits, with an intent and purpose to influence the performance of, or for the past, present or future performance of, an act within the official discretion of the Board of County Commissioners of Hillsborough County for the purpose of receiving a benefit for themselves or others;

(5) would use or manipulate, together with corrupt Hillsborough County Commissioners, and others the rules, regulations, procedures or ordinances of the Board of County Commissioners of Hillsborough County;

(6) would themselves and together with others insulate, protect, promote, foster, further, facilitate and enlarge the conspiracy.

### *The Defendants and the Mailing*

2. It was further a part of the scheme that defendant ROBERT E. CURRY, NELSON ITALIANO and others would and did engage in the acts set forth in paragraph 14 of COUNT TWO of this Indictment, which paragraph is incorporated by reference herein.

(14.) Between in or about January, 1980 and in or about December, 1980, Nelson Italiano and others, corruptly offered, promised and gave Charles Frank Bean III and ROBERT E. CURRY, public servants, and Charles Frank Bean III and ROBERT E. CURRY, corruptly requested, solicited, agreed to accept and accepted, a benefit with an intent and purpose to influence an act which Nelson Italiano believed to be, and Charles Frank Bean III represented as being, within the official discretion of Charles Frank Bean III and ROBERT E. CURRY relating to Cable Television Franchise Agreement No. 80-563; chargeable under Florida Statutes, Section 838.015, and an act of racketeering involving bribery as defined by Title 18, United States Code, Section 1961(1).

3. On or about August 8, 1980, the defendants,

### ROBERT E. CURRY

and

### NELSON ITALIANO,

and others who are both known and unknown to the Grand Jury, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly caused to be placed in an authorized depository for mail matter to be delivered by the United States Postal Service, an envelope containing a letter to Rudy Spoto from Dennis J. McGillicuddy addressed to:

Mr. Rudy Spoto

Rudy Spoto, Inc.

P.O. Box 393

Tampa, Florida 33601

In violation of Title 18, United States Code, Sections 1341 and 2.