**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Stanley P. GIMBEL,**
**Defendant-Appellant.**

No. 86–1808.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 27, 1987.

Decided Aug. 6, 1987.

---

Jeffrey Cole, Jeffrey Neal Cole, Ltd., Chicago, Ill., for defendant-appellant.

R. Roger Markley, Sp. Asst. U.S. Atty., Anton Valukas, U.S. Atty., for plaintiff-appellee.

Before POSNER, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

During 1982 and 1983, Stanley Gimbel "structured" certain bank deposits and withdrawals in a manner that circumvented the existing currency reporting requirements. Gimbel also provided legal advice to his clients regarding how to structure financial transactions so as to minimize the information available to the Internal Revenue Service. He may also have recommended to his clients that they misstate income on their tax returns. Gimbel was convicted of: causing a financial institution to conceal a material fact from the United States; mail fraud; and wire fraud. We conclude that the indictment did not allege a violation of the statutes under which Gimbel was convicted. We therefore reverse Gimbel's conviction.

## I.

In April, 1982, the federal government began a narcotics investigation in Milwaukee. In the course of the investigation, Special Agent Walter Perry of the Internal Revenue Service met the appellant, Stanley Gimbel, a lawyer who represented individuals involved in narcotics trafficking. The government later broadened its investigation to include the question of whether Gimbel was violating the tax laws.

Because Gimbel is contesting his convictions, we must "take all evidence and permissible inferences in the light most favorable to the prosecution." *United States v. Bentley*, 825 F.2d 1104, 1107 (7th Cir.1987). The evidence indicates that between July

15, 1982 and April 15, 1983, Perry and Gimbel had forty-five separate conversations. During this period, Perry suggested that Gimbel allow him to wire $125,000 from Switzerland to the trust fund account of Gimbel's law firm. Gimbel agreed. At Perry's request, Gimbel later withdrew the money. However, rather than withdrawing the money in a lump sum, Gimbel "structured" the transaction by having his bank issue eleven cashier's checks for $9,990.00. Gimbel then disbursed the money to another undercover agent who posed as a "bagman." By structuring the transactions in this manner, Gimbel apparently hoped to avoid triggering federal currency reporting requirements, which provided that a Currency Transaction Report ("CTR") must be filed for each domestic currency transactions by a financial institution in excess of $10,000. *See* 31 U.S.C. § 5313 (1982). However, even though Gimbel structured the transaction, the bank did in fact file a CTR with the Treasury Department.

Perry and Gimbel also had several discussions in which Perry requested advice concerning his tax returns. The jury could have concluded that, during these conversations, Gimbel recommended that Perry misstate his income on his federal tax returns. The government also alleges that Gimbel provided Perry with additional information as to how Perry could avoid triggering federal currency reporting requirements.

As part of its investigation of Gimbel, the government reviewed banking transactions that Gimbel had made on behalf of his clients. The government investigators discovered that on twelve separate days between May, 1982 and April, 1983, Gimbel had deposited clients' funds into his law firm's trust account at the First Bank-Milwaukee. On each day, the aggregate amount of the deposit into the trust fund had been in excess of $10,000. However, in each case, Gimbel had split the deposit among several deposit slips, each bearing his own name, before giving the deposit to the bank teller. As a result, the bank had not filed a Currency Transaction Report for any of these transactions. The govern-

ment investigation also uncovered evidence indicating that Gimbel had assisted clients in filing tax returns that misstated their income.

Based on the information that the investigation had uncovered, a grand jury returned a sixteen-count indictment against Gimbel on January 17, 1984. The indictment was premised on the theory that the Currency and Foreign Transactions Reporting Act of 1970, 31 U.S.C. §§ 5311-22 (1982), imposed an obligation on Gimbel's bank to submit Currency Transaction Reports listing the real parties in interest on whose behalf Gimbel had made the transactions. The indictment charged that by structuring his transactions, Gimbel had caused the First Bank-Milwaukee to fail to disclose material facts to the government, in violation of 18 U.S.C. § 2(b) and § 1001. Gimbel contested the indictment, arguing, *inter alia,* that it failed to state an offense. The district court, concluding that financial institutions had no duty to reveal the real parties in interest on whose behalf the transactions had been made, dismissed the indictment. *See United States v. Gimbel ("Gimbel I"),* 632 F.Supp. 713, 727 (E.D. Wis.1984).

On July 16, 1985, a second grand jury returned a six-count indictment against Gimbel. The new indictment again charged Gimbel with violating 18 U.S.C. § 2(b) and § 1001. However, the second indictment was premised on the theory that the bank had a duty to disclose the aggregate amount of each transaction, rather than the parties on whose behalf Gimbel had performed them. The second indictment also charged that Gimbel had committed mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and § 1343. The government's theory was that Gimbel's actions constituted a "scheme" to impede the Treasury Department from collecting Currency Transaction Reports and other "data to be used to determine the correct source and amount of income in the determination and assessment of ... income taxes." *See United States v. Gimbel ("Gimbel II"),* 632 F.Supp. 748, 764 (E.D.Wis.1985) (reprinting indictment).

Gimbel challenged the second indictment, alleging that it failed to state an offense under 18 U.S.C. § 2(b) and § 1001. However, this time the district court rejected his claim, ruling that the Currency Transactions Reporting Act required an institution to report daily transactions by a customer that, in the aggregate, exceeded $10,000. *See id.* at 752–55. Gimbel also alleged that the indictment failed to state an offense under the mail fraud and wire fraud statute. The district court rejected this claim as well.

Gimbel's case was tried to a jury. He was convicted on Count I, which charged him with violating 18 U.S.C. § 2(b) and § 1001; on Counts III and IV, which charged wire fraud; and on Count V, which charged mail fraud. On appeal, he renews his claim that the indictment was legally insufficient.[1]

## II.

■ In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating. If the acts alleged in the indictment did not constitute a violation of the law that the defendant has been charged with violating, we must reverse any subsequent conviction based on that indictment. *See McNally v. United States,* — U.S. —, —, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (*quoting Fasulo v. United States,* 272 U.S. 620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926)). Count I of the indictment in this case alleged that by structuring his transactions, Gimbel had

violated 18 U.S.C. § 2(b) and § 1001 which, in combination, bar an individual from causing another individual or entity to fail to disclose a material fact to the United States government. We conclude that the fact that Gimbel caused First Bank-Milwaukee to fail to disclose his structured transactions did not constitute the crime of causing an entity to fail to disclose a material fact.

■ Section 2(b) of Title 18 provides that an individual who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal" for the substantive offense. 18 U.S.C. § 2(b) (1982). In this case, the "offense against the United States" is the violation of 18 U.S.C. § 1001, which bars an individual or entity from "knowingly and willfully ... conceal[ing] ... a material fact" that is "within the jurisdiction of any department or agency of the United States," 18 U.S.C. § 1001 (1982). The allegedly "material facts" in this case were Gimbel's structured currency transactions. The government concedes that for a fact to be "material," an individual or entity must have a duty to disclose it. *See United States v. Irwin,* 654 F.2d 671, 678 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). The dispositive question, therefore, is whether the Currency and Foreign Transactions Reporting Act of 1970, 31 U.S.C. §§ 5311–22 (1982), imposed a duty on First Bank-Milwaukee to report Gimbel's structured transactions. We conclude that it did not.[2]

---

1. Gimbel also claims that his conviction must be reversed because: 18 U.S.C. §§ 2(b), 1001, 1341, and 1343 are unconstitutionally vague as applied to him; Count I charged multiple offenses in the same count; the mailing of the CTR by Gimbel's bank could not, as a matter of law, be in furtherance of a scheme to conceal information from the government; the court failed to suppress certain evidence; the court admitted certain unduly prejudicial evidence; the court admitted evidence of acts that occurred after the period covered by the indictment; and the court improperly charged the jury. Because of our disposition of this case, we need not reach any of these claims.

2. The government concedes that Gimbel had no duty to inform the Treasury Department of his structured transactions. He therefore lacked the legal capacity to violate § 1001 in this case. However, the government argues that Gimbel may be held liable under § 2(b) for causing the First Bank-Milwaukee to fail to file a Currency Transaction Report. We have never decided whether § 2(b) may be used to impose criminal liability on an individual who lacks the capacity to commit the underlying offense. However, for purposes of this appeal we will assume, without deciding, that § 2(b) may be used for this purpose. *See United States v. Ruffin,* 613 F.2d 408, 413–16 (2d Cir.1979). *But see id.* at 417–27 (Wyatt, D.J., dissenting).

The Currency Transactions Reporting Act authorized the Secretary of the Treasury to promulgate regulations requiring "a domestic financial institution ... and any other participant in [a domestic financial] transaction ... [to] file a report on the transaction." *Id.* at § 5313(a). Pursuant to this authority, the Secretary of the Treasury promulgated regulations in 1980 directing that financial institutions "file a report of each deposit [or] withdrawal ... which involves a transaction of more than $10,000," 31 C.F.R. § 103.22(a) (1986). These regulations defined a "transaction" to mean "the physical transfer of currency from one person to another." *Id.* at § 103.11. The Department of the Treasury later issued a Form 4789, which was to be used to file Currency Transaction Reports. This form specifically stated that "[m]ultiple transactions by or for any person which in any one day total more than $10,000 should be treated as a single transaction, if the financial institution is aware of them." United States Department of Treasury, Form 4789 (1982) (*reproduced in Gimbel I,* 632 F.Supp. 713, 729 (E.D.Wis.1984)). The Treasury Department has recently promulgated new regulations requiring financial institutions to aggregate structured transactions. *See* 52 Fed.Reg. 11,436 (Apr. 8, 1987) (amending 31 C.F.R. § 103.22(a) (1986)).

At least five other circuits have considered whether, prior to the 1987 regulations, the Currency Transactions Reporting Act required a financial institution to file a report when an individual structured a transaction by making multiple deposits or withdrawals which exceeded $10,000 at the same bank on the same day. The First, Fifth, and Eleventh Circuits have adopted a "substance-over-form approach," *United States v. Tobon-Builes,* 706 F.2d 1092, 1098 (11th Cir.1983), holding that even prior to the recent regulations, the Currency Transactions Reporting Act required financial institutions to report such transactions. The Fifth Circuit has reasoned that the Act itself required reporting of transactions in currency of more than $10,000, and that individuals were barred from thwarting this requirement by structuring their trans-

actions. *See United States v. Thompson,* 603 F.2d 1200, 1203 (5th Cir.1979). Moreover, all three of these circuits have read the regulations requiring financial institutions to report each "physical transfer" of currency in excess of $10,000 to mean that a financial institution must aggregate all transactions by one customer on one day. *See United States v. Bank of New England,* 821 F.2d 844, 849–50 (1st Cir.1987); *United States v. Cure,* 804 F.2d 625, 629 (11th Cir.1986); *Thompson,* 603 F.2d at 1202–03. The Fifth and Eleventh Circuits have further relied on the language of Form 4789, which directed financial institutions to aggregate same-day transactions. *See Tobon-Builes,* 706 F.2d at 1097–98; *Thompson,* 603 F.2d at 1203; *see also United States v. Heyman,* 794 F.2d 788, 792 n. 6 (2d Cir.1986) (*dictum*) (suggesting that individuals may be liable for structuring pre–1985 transactions).

Although we share the First, Fifth, and Eleventh Circuits' concern about the need to rigorously enforce the currency laws, we believe that the analysis used by the Eighth and Ninth Circuits is more compelling. As the Eighth Circuit recognized, the Currency Transactions Reporting Act did not require the reporting of transactions in excess of $10,000. The Act did nothing more than authorize the Secretary of the Treasury to promulgate regulations governing disclosure. *See United States v. Larson,* 796 F.2d 244, 245 (8th Cir.1986). The regulations that the Secretary promulgated under this authority did not expressly require aggregation. Rather, they merely required financial institutions to report "physical transfers of currency," 31 C.F.R. § 103.11 (1986), in excess of $10,000. The essential characteristic of a structured transaction is that the customer effects several discrete "physical transfer[s] of currency," *id.* The original regulations gave no hint that financial institutions were required to assess the economic reality behind these acts.

Prior to April, 1987, the only reference by the Treasury Department to aggregation was contained in Form 4789. However, as the Ninth Circuit recognized, Form

4789 was not promulgated in accordance with the procedures set forth in § 553 of the Administrative Procedure Act. *See United States v. Reinis,* 794 F.2d 506, 508 (9th Cir.1986). Therefore, the directions contained on the form constitute nothing more than interpretive rules. *See Production Tool Corporation v. Employment and Training Administration,* 688 F.2d 1161, 1164 (7th Cir.1982). Although such rules may sometimes be persuasive evidence of the requirements of the statute pursuant to which they were promulgated, they do not themselves have the force of law, and therefore cannot impose a legal duty. *Id.*

Because the First Bank-Milwaukee had no duty to report Gimbel's structured transactions, these transactions did not constitute "material facts" within the meaning of 18 U.S.C. § 1001. Consequently, Gimbel may not be held criminally liable under 18 U.S.C. § 2(b) for causing First Bank-Milwaukee to fail to disclose a material fact.

### III.

■ Count V of the indictment charged Gimbel with mail fraud in violation of 18 U.S.C. § 1341. The mail fraud statute contains two elements: the existence of a "scheme," and the use of the mails in furtherance of the scheme. In this case, the indictment stated that the "scheme" consisted of depriving the Treasury Department of Currency Transaction Reports and of other "accurate and truthful information and data." We conclude that the indictment did not state an offense, because it did not charge that the scheme deprived the Treasury Department of money or property.

The mail fraud statute proscribes using the mails to facilitate "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises," 18 U.S.C. § 1341 (1982). Our previous cases have interpreted this language as covering two separate categories of offenses: schemes to "obtain money or property" and schemes to "defraud." We have held that

schemes to defraud encompass deprivations of certain "intangible rights" such as an employer's right to the honest and loyal services of its employees, *see, e.g., United States v. George,* 477 F.2d 508 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973), and the citizenry's right to have its public officials discharge their duties faithfully, *see, e.g., United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed. 2d 1146 (1974). The intangible rights theory has enabled the government to root out deeply-entrenched wrongdoing. However, the Supreme Court has recently held that the mail fraud statute is "limited in scope to the protection of property rights," *McNally v. United States,* —— U.S. ——, ——, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987), and that it does not proscribe schemes to defraud individuals or entities of intangible rights, *id.*

In light of *McNally,* we must determine whether the scheme charged in the indictment in this case constituted a scheme to deprive the Department of the Treasury of "money or property." The government argues that because Gimbel's scheme concealed information from the Treasury Department which, if disclosed, might have resulted in the Department assessing tax deficiencies, Gimbel was in effect depriving the Treasury of tax revenues. Although the Fifth Circuit (in a case decided prior to *McNally*) held that a scheme to deprive the Treasury of information constituted a scheme to deprive it of money, *see United States v. Herron,* 816 F.2d 1036, 1040–42 (5th Cir.1987), we do not believe that this argument can be maintained in light of the Supreme Court's recent decision.

In *McNally,* the petitioners were convicted for carrying out a scheme in which an insurance brokerage firm, which received commissions from the state, kicked back a portion of these commissions to insurance companies controlled by the petitioners. The indictment charged, in effect, that the petitioners "had failed to disclose their financial interests ... to other persons in the state government whose actions could have been affected by the disclosure," *McNally,*

— U.S. at —— n. 9, 107 S.Ct. at 2882 n. 9. The Supreme Court concluded that this did not state an offense under the mail fraud statute because the indictment did not allege that the state "was defrauded of any money or property," *id.* at ——, 107 S.Ct. at 2882.

We believe that Gimbel's indictment, like the indictment in *McNally*, does not allege a scheme to defraud the government of money or property. In this case, as in *McNally*, the defendant is accused of not providing information to government officials "whose actions could have been affected by the disclosure," *id.* at —— n. 9, 107 S.Ct. at 2882 n. 9. The only possible distinction is that the indictment in this case is based on the deprivation of information to Treasury Department officials, whose primary function is to collect revenue, while the indictment in *McNally* did not refer to a government agency specifically involved in financial matters. However, this distinction is not significant. Had the petitioners in *McNally* disclosed information about their activities to *any* state officials, those officials might have taken action to recoup payments made to the insurance brokerage firm. The relevant fact in both cases is that the jury was not required to find that the scheme resulted in the government being deprived of money or property.[3]

We conclude that the indictment does not state an offense under the mail fraud statute. We therefore reverse Gimbel's conviction on Count V.

## IV.

■■ Counts III and IV were based on the same scheme as Count V. However, these counts alleged that Gimbel had used the wires in furtherance of the scheme, in violation of 18 U.S.C. § 1343. In *McNally*, the Supreme Court limited its discussion to

the mail fraud statute. We must therefore decide whether the standards set forth in *McNally* also apply to prosecutions under the wire fraud statute.

The wire fraud statute proscribes the use of wire communications to facilitate "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343 (1982). This is precisely the same language contained in the mail fraud statute. *See* 18 U.S.C. § 1341 (1982). The legislative history of the Communications Act indicates that, in enacting the wire fraud statute, Congress "intended merely to establish ... a parallel provision now in the law for fraud by mail," S.Rep. No. 44, 82d Cong., 1st Sess. 19 (1951). Accordingly, we have consistently recognized that "cases construing the mail fraud statute are applicable to the wire fraud statute." *United States v. Feldman*, 711 F.2d 758, 763 n. 1 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983). We see no basis on which we can depart from this approach. We therefore conclude that the wire fraud statute is "limited in scope to the protection of property rights," *McNally*, —— U.S. at ——, 107 S.Ct. at 2881.

The indictment in this case alleged a scheme that was outside the scope of § 1343. Therefore, Gimbel's conviction on Count III and Count IV must also be reversed.

## V.

The First Bank-Milwaukee had no obligation to submit Currency Transaction Reports informing the Treasury Department of Gimbel's structured transactions. Therefore, Gimbel cannot be held criminally liable for causing the bank to fail to disclose a material fact. In addition, because the indictment did not allege that

---

**3.** We express no view as to whether a scheme to deprive the government of tax dollars can ever be cognizable under the mail fraud statute. *See McNally*, —— U.S. at —— n. 4, 107 S.Ct. at 2878 n. 4 (error to include tax fraud issues in mail fraud count); *id.* at —— n. 8, 107 S.Ct. at 2881 n. 8 (scheme must injure government in its role as "property-holder"). Neither do we express

any view as to whether a scheme that has not reached fruition, and in which there is no resulting loss of money or property, may ever form the basis of a mail fraud prosecution. *See United States v. Keane*, 522 F.2d 534, 545 (7th Cir.1975) (The "ultimate success" of the scheme is not "crucial to a successful prosecution.").

Gimbel had deprived the Treasury Department of money or property, we reverse his mail fraud and wire fraud convictions.

REVERSED.