UNITED STATES of America,
Plaintiff–Appellee,

v.

Bridget C. JONES,
Defendant–Appellant.

No. 90–1364.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1990.

Decided July 25, 1991.

Patrick J. Chesley, Asst. U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Jon G. Noll, Springfield, Ill., for defendant-appellant.

Before WOOD, Jr., COFFEY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

A "loan procurement program" promoted to desperate or gullible persons generated over $11 million in procurement fees for Bridget and Richard Jones. No loans were ever procured and no taxes were ever paid on the fees received. Mrs. Jones was convicted of wire fraud, obstruction of justice and conspiracy. After failing to appear for sentencing, Mrs. Jones was apprehended and received a twenty-five year prison term. She appeals her convictions and sentence, raising a variety of arguments, and we affirm.

I.

Bridget C. Jones and her late husband, Richard L. Jones, operated what was termed an advance fee loan program. For a $4,000 fee paid up front, they promised to arrange a $100 million loan for the applicant. From the standpoint of Bridget and Richard Jones the program was quite successful. By April 15, 1986, (the date Richard died) the couple had accumulated more than $10 million from procurement fees received from approximately 4,000 clients who joined their programs. The money generated from this scheme was placed in more than 100 banks located throughout the United States. No taxes were paid on any of the fees received by Mrs. Jones and her husband. Not incidentally, no loans were ever arranged.

In early 1986, Bridget and Richard Jones learned that the government had been subpoenaing records from their bank accounts. This news prompted them to take steps to move the money in those accounts outside the United States. To accomplish this international transfer of funds Mrs. Jones and her husband sought the assistance of Joan McIntosh and a Swiss banker named Harry Wanke. McIntosh claimed to be in the business of protecting people's money from being taxed. A plan was developed whereby Richard Jones would write checks on all his bank accounts and make them payable to sham corporations. The checks would be given to McIntosh, who would deposit them in a bank account she controlled in Denver, commingling them with other funds in that account. From the Denver account McIntosh would then move the funds to New York where Wanke would deposit them with a bank having a correspondent relationship with Wanke's bank in Zurich, Switzerland. Wanke would then arrange for the funds to be wire-transferred from the New York bank to his Swiss bank. No reporting or disclosure of the actual ownership of the funds was to be made.

Bridget and Richard Jones had various bank accounts in Bloomington, Illinois, the base of their operations. Prior to his death and consistent with the plan to move the funds out of the country, Richard Jones depleted his bank accounts outside of Bloomington by writing multiple checks in amounts of less than $10,000 payable to dummy corporations. These checks totalled nearly $6 million. In late March and early April of 1986, Mrs. Jones and her husband sent $500,000 of the checks made payable to the sham corporations to McIntosh. On April 12, 1986, Bridget and Richard Jones, McIntosh, Wanke and others met in Chicago. Mrs. Jones and her husband decided that of the $500,000 sent to McIntosh, $200,000 would be used to test the system devised for getting the money to Switzerland. The balance of the $500,000 would be used to establish trusts.

Three days later Richard Jones died. A week later, a federal grand jury subpoena was served on Mrs. Jones directing her to produce records relating to the loan program. After receiving the subpoena Mrs. Jones directed that the subpoenaed records be removed from her house, microfilmed and then burned. Although she was given immunity for the act of producing the records of the loan program, Mrs. Jones stated that she had no intention of turning the records over to the grand jury.

During this time, the Internal Revenue Service made two jeopardy assessments against Richard Jones' estate. The first assessment in the sum of $3.8 million was made in middle or late April of 1986. The second assessment for $10.25 million was made in the middle of June of 1986. Bridget Jones received notifications of the levies and was heard repeatedly to say that she wanted to move the money outside the United States to avoid seizure.

After Richard Jones' death, Bridget Jones assumed sole control over the operations of the advance fee loan program. She also pursued the scheme to move the untaxed money outside the United States to prevent its seizure by the Internal Revenue Service. On May 7, 1986, Mrs. Jones met with McIntosh in Denver, Colorado, and gave McIntosh an additional $239,000. Mrs. Jones directed her to funnel $100,000 to the overseas bank accounts and to retain $139,000 as an escape fund for Mrs. Jones and her family.

Seven days later on May 14, 1986, Mrs. Jones met with Rupert Henry and Robin Baily in Miami, Florida. The purpose of this meeting was to arrange the transfer of approximately $290,000 out of the country to bank accounts in Panama.

On May 21, 1986, Mrs. Jones divided the remaining checks written to the dummy corporations into two groups. Mrs. Jones directed that one group of checks totalling $2,841,172.10 be given to Rupert Henry for deposit in the Panamanian bank accounts. The second group of checks, totalling $3,024,627.48 was given to McIntosh for deposit in the Swiss bank accounts.

The advance fee loan program continued to generate fees. On May 27, 1986, Mrs. Jones received an additional $1 million

from the loan program brought in subsequent to her husband's death. Of this income to Mrs. Jones, approximately $800,-000 was in the form of checks. Mrs. Jones directed that the checks be converted to cash without the filing of any Currency Transaction Reports with her name on them. However, the transfer of the cash to Panama could not be arranged and Mrs. Jones decided to move the cash outside the United States through McIntosh and Wanke. At Mrs. Jones' direction, $500,000 in cash was given directly to Wanke in New York. Wanke agreed not to disclose Mrs. Jones' identity on any Currency Transaction Reports. Wanke received the $500,000 in cash in New York and was arrested.

Mrs. Jones was charged with one count of conspiracy in violation of 18 U.S.C. § 371; four counts of wire fraud in violation of 18 U.S.C. § 1343; and one count of obstruction of justice in violation of 18 U.S.C. § 1503.

After trial, the jury found Mrs. Jones guilty on all six counts. The district judge set the case for sentencing and agreed to release Mrs. Jones pending sentencing. Mrs. Jones fled and remained at-large for over two and one-half years. After being apprehended and returned for sentencing, the district judge sentenced her to twenty-five years imprisonment.

Mrs. Jones alleges many errors on appeal. The only claims that merit discussion are: that the wire fraud counts did not state an offense because the government did not allege a scheme intended to deprive the victims of money or property; that the conspiracy count did not state an offense because Mrs. Jones could not have been convicted of the substantive offense of failure to file certain reports; that she was denied her constitutional right to proceed *pro se* at trial; that her sentence was unduly harsh; and that it was error for the

magistrate to conduct jury selection. We now address these claims.

## II.

■ Bridget Jones asserts that the scheme alleged in the indictment did not constitute a scheme to deprive the Treasury Department of money or property as required by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[1] We noted in *United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir.1987) that the standards set forth for mail fraud schemes under *McNally* are applicable to wire fraud schemes as well. We have considered a number of cases reviewing whether the scheme alleged fell within the "intangible rights" theory invalidated by *McNally*. But we do not look solely at the indictment when making this determination on this direct appeal. "When the jury must have found a deprivation of property, we affirm on direct appeal even though the indictment was cast in terms of intangible rights." *Toulabi v. United States*, 875 F.2d 122, 123 (7th Cir.1989). Our concern, as we noted in *Gimbel*, 830 F.2d at 627, is whether the jury was required to find that the scheme resulted in the government being deprived of money or property. As we noted in *United States v. Wellman*, 830 F.2d 1453, 1462 (7th Cir.1987), "we must look to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense."

We considered a situation somewhat similar to the one facing Jones in *Gimbel*. There the government alleged that the defendant used a scheme "to impede the Treasury Department from collecting Currency Transaction Reports and other 'data to be used to determine the correct source and amount of income in the determination and assessment of ... income taxes.'"

1. In *McNally,* the Supreme Court held that the mail fraud statute was limited in scope to the protection of property rights. But as the Court noted in *Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987), *McNally* did not limit the scope of the mail fraud statute to only tangible property rights.

Intangible property rights as well are within the scope of the mail fraud statutes. *See Frank v. United States*, 914 F.2d 828, 830 n. 4 (7th Cir. 1990). The question then is whether the government alleged a scheme to deprive the victim (here the United States) of money or property.

*Gimbel,* 830 F.2d at 623 (citation omitted). We found that because the jury "was not required to find that the scheme resulted in the government being deprived of money or property," the indictment failed to state an offense under the mail fraud statute. *Id.* at 627.

In *United States v. Bucey,* 876 F.2d 1297 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989), we found that allegations charging the defendant with devising a scheme "to defraud the United States of money and property, that is, income taxes" satisfied the "money or property" requirement of *McNally.* This resolved a question left open in *Gimbel* as to whether the government had a property interest in income taxes due and owing. Jones must show that the jury was not required to find that the scheme resulted in the government being deprived of money or property.

■ The superseding indictment charged that Jones devised a scheme to defraud the United States by obstructing, impairing and defeating the Treasury Department's lawful functions of collecting data and reports of currency transactions at financial institutions in excess of $10,000, and of obtaining accurate and truthful information and data to be used to determine the correct source and amount of income and to determine income taxes.

Jones, in analyzing the scheme alleged, ignores the other language in the indictment, the evidence, and the jury instructions. Dispositive for our purposes are the jury instructions given at the close of trial. The jury was first instructed as to the wire fraud count.[2] Then the jury was given the definition of "intent to defraud."[3] With these two instructions, the jury could not convict simply for failure to provide information. Because the instruction phrased "information" and "tax revenues" in the conjunctive, the jury here was required to find that the scheme resulted in the government being deprived of money or property. This is the critical distinction between the situation here and the one faced by the court in *Gimbel.*

The proof at trial removed any doubt regarding the scheme's effect. The proof showed that Jones was engaged in an elaborate scam designed to evade federal income taxation. It is clear that the wire fraud charges properly stated an offense under the statute.

■ The second issue we address is whether the charge of conspiracy in the indictment was legally sufficient to allege a violation of the federal statute. Jones was charged in a superseding indictment with conspiracy to defraud the United States in relation to the failure to file Currency Transaction Reports with the IRS.[4] Jones

---

**2.** To sustain the charge of wire fraud, the government must prove the following propositions:

> First: That the defendant knowingly devised or intended to devise and participated in the scheme to defraud as described in this indictment;
> Second: That for the purpose of carrying out the scheme, the defendant caused interstate or foreign wire communications to take place in the manner charged in the particular counts; and
> Third: That the defendant did so knowingly *and with the intent to defraud.*
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
> If, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

**3.** "The phrase 'intent to defraud' means that the acts charged were done knowingly with the intent to deceive the United States in order to cause the loss to the Department of Treasury of information *and tax revenues.*"

**4.** The superseding indictment charged that Jones conspired:

> a. to defraud the United States, and in particular the Internal Revenue Service, by impairing, obstructing and defeating its lawful governmental functions of the obtaining of accurate and truthful information and data to be used to determine the correct source and amount of income and in the determination, assessment, collection and payment of the revenue, that is income taxes[;]
> b. to defraud the United States, in particular the Internal Revenue Service, by impairing, obstructing and defeating its lawful governmental function to collect data and information regarding currency transactions in excess of $10,000 .at financial institutions operating within the United States;

argues that because she is not a financial institution, she cannot be charged with conspiring to fail to file CTRs.

In *Bucey*, 876 F.2d 1297, we reversed the defendant's conviction for violation of the substantive offense of failing to file CTRs. But that case is of no aid to Jones. The government in *Bucey* contended that when Bucey received currency from undercover government agents, he himself was a financial institution and was obligated to file CTRs. Jones was not charged with the substantive counts of failure to file such reports. She was charged with conspiring to defraud the United States and conspiring to fail to file CTRs.

As is apparent from the part of the indictment set forth in footnote 4, the conspiracy charge alleged three objectives. We have noted the general rule that "when an indictment alleges a conspiracy with multifarious objectives, a conviction will be sustained so long as the evidence is sufficient to show that the defendants agreed to accomplish at least one of the alleged objectives." *Id.* at 1312. This is true so long as none of the objectives on which the jury relied in rendering its general verdict involved a legally invalid or unconstitutional basis for conviction. *Id.* at 1312 n. 27.

In *Bucey*, the defendant was charged with conspiracy to, among other things, impair the Treasury Department's collection of information through accurate CTRs, and the conviction on that count was affirmed. *Id.* at 1312–13. We conclude that Jones' situation is similar to Bucey's: "Although Bucey's failure to file CTRs and failure to disclose the source of currency on Form 4789 are not unlawful acts, these acts 'lost their lawful character when considered as part of a scheme to intentionally deprive the government of material information it would otherwise receive.'" *Id.* at 1313 (citation omitted). Also instructive is the Third Circuit's opinion in *United States v. Donahue*, 885 F.2d 45, 48 (3d Cir.1989), where the court held that "[w]hile Donahue himself could not have been held liable for

a failure to file CTRs, this does not foreclose his criminal liability for conspiring to do so. A person, even though incapable of committing the underlying substantive offense, can be convicted of conspiracy under 18 U.S.C. § 371." The conspiracy count properly stated an offense, and Jones' conviction on that count was proper.

■ Jones next argues that she was denied her constitutional right to proceed *pro se*, as described by the Supreme Court in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). We have held that the demand to proceed *pro se* must be unequivocal and timely. *United States v. Oakey*, 853 F.2d 551, 553 (7th Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 977 (1989).

■ We first inquire as to whether Jones' request to proceed *pro se* was unequivocal. Jones never informed the court specifically that she wanted to proceed *pro se*. Her attorney, who had been retained by Jones several months earlier, addressed the court regarding Jones' dissatisfaction with his refusal to file certain motions, and stated that Jones was prepared to proceed *pro se* rather than have him represent her. The attorney then went on to request that the court allow him to withdraw, and to ask for a continuance so that she could obtain other counsel. The court denied the attorney's motion to withdraw.

While personally addressing the court in discussing her dissatisfaction with current counsel, Jones told the court she had been attempting to secure alternate counsel. Jones then admitted that her objections to counsel's performance had to do with a disagreement regarding trial tactics. The court granted Jones a sort of hybrid representation, where she was represented by counsel, but where she could file any *pro se* documents she felt were relevant, and those documents would be considered by the court. It appears that Jones was seeking more time to retain other counsel rather than seeking to proceed *pro se*. Regard-

c. to fail to file with the Internal Revenue Service Currency Transaction Reports (IRS Form 4789) for currency transactions occur-

ring within the United States in excess of $10,000, in violation of Title 31, United States Code, Sections 5313 and 5322.

less, there was never any unequivocal request to proceed *pro se.*

The assertion of the right to proceed *pro se* must also be timely. We noted in *Oakey* our agreement with the decision in *United States v. Smith,* 780 F.2d 810 (9th Cir. 1986). There the Ninth Circuit found that the demand for self-representation must be made before meaningful trial proceedings, such as jury selection, have occurred. Jones' assertion, if occurring at all, came on the second day of trial after the jury had been selected but prior to taking its oath. The district court noted that the previous day, the defense had answered affirmatively when asked if it was ready for trial. We find no error in not allowing the defendant to proceed *pro se* when the assertion of the right, if made at all, was neither unequivocal nor timely.

■ Jones alleges that her sentence was too harsh. This is a "pre-Guidelines" case—that is, the offenses were committed prior to the implementation of the Sentencing Guidelines. The standard for reviewing a "pre-Guidelines" sentencing decision of the district court is extremely narrow. We will affirm the district court's sentence that was within the statutory limits unless "the court based that sentence upon improper considerations or unreliable information in exercising its discretion or failed to exercise any discretion at all in imposing the sentence." *United States v. Lewis,* 910 F.2d 1367, 1373 (7th Cir.1990).

This defendant deserves a very substantial sentence, but a sentence of 25 years in a case in which no weapon was used and no life was put in jeopardy seems to us to be pushing the outer limits. At sentencing the government recommended imprisonment for 15 years, to be followed by 5 years probation, a recommendation that seems to us to have been fair and realistic, but the district judge disregarded it.

Why this particular sentence was imposed may possibly be suggested in the record. The defendant after being found guilty fled the jurisdiction, and for two and one-half years was missing. Before that happened, however, when the defendant's bail was being considered after her conviction, the district judge recognized that there was a distinct possibility that the defendant likely had access to large sums of money, and facing a 30–year sentence, might flee. The government held the same view, but opposed releasing the defendant prior to sentencing. The government regarded her as a definite flight risk. As the government pointed out she had previously set up an "escape fund." Although the government was not sure of that fund's availability at that moment, the government also pointed out that she had secreted other sums of money in various places in the world and some was available. Nevertheless, the district judge continued the defendant on her five hundred thousand dollar personal recognizance. It may be that the court was influenced by the fact she had two children and another on the way. The district judge certainly warned her adequately about what would happen if she violated the conditions of her bond. As the district judge put it, "I'll fall on her like a ton of bricks." She did and he did.

At sentencing it is apparent that the district judge well remembered his admonition in the prior year. He explained, "I am sentencing you today not only for those six convictions, but also for this mockery that you had made of our democracy and that which has held this country together for well over two hundred years." The defendant was, however, separately indicted and punished for that interim crime of jumping bail. The defendant appears to have paid heavily for her unlawful flight. Imprisonment was deserved, but the court, against the advice of the government, had originally provided her the opportunity to do what she did. Flight was almost certain to happen. That court therefore should share some of the responsibility.

We believe the government recommendation would have been adequate.[5] However,

---

5. At oral argument government counsel was asked what had happened in the interim since its earlier 15–year recommendation to the sentencing court to cause it to now urge affirmance of the 25–year sentence. "Nothing," was the answer, "but sentencing was the court's preroga-

on review considering our own limitations, we will not undertake to adjust this sentence downward.

 The final issue we address is whether it was error for the magistrate to conduct the jury selection. Jones does not allege that she objected to the procedure, so we are left with a determination as to whether this was plain error. Although there is some confusion as to whether Jones simply did not object or in fact consented to this procedure, our outcome is the same under either scenario.

Our opinions in *United States v. Wey*, 895 F.2d 429 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3283, 111 L.Ed.2d 792 (1990) and *United States v. Lake*, 910 F.2d 414 (7th Cir.1990), control our decision on this issue. In *Wey*, we held that jury selection by a magistrate was not plain error. *Wey*, 895 F.2d at 431. Jones did not object to the procedure, and any error did not rise to the level of reversible error. Furthermore, there was some indication by counsel for Jones at oral argument that Jones in fact consented to this procedure. In *Lake* we held that when a defendant consents, a federal magistrate may conduct the selection of the jury in a felony case. *Lake*, 910 F.2d at 417. This position is consistent with the Supreme Court's recent decision in *Peretz v. United States*, —— U.S. ——, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991). Thus, there was no reversible error in the magistrate's action in selecting the jury in this case.

The defendant raises a number of other arguments on appeal. These other arguments are without merit and warrant no further discussion.

### III.

For the foregoing reasons, the conviction and sentence of Bridget C. Jones are AFFIRMED.

tive and [it is] the government's responsibility to support it." It was a good answer.