In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-2989

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAZANDA MOORE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-CR-211—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED SEPTEMBER 13, 2005—DECIDED MAY 2, 2006

Before POSNER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* The practice of favoring close family members or friends with lucrative government contracts is hardly a new one, but, at least in modern times, it is usually forbidden. This case involves a variant of that story, in which a jury found defendant LaZanda Moore guilty of violating 18 U.S.C. § 1001(a)(1), by participating in a scheme to conceal a material fact from the City of Milwaukee (the City), which in turn was receiving federal monies from the Department of Housing and Urban Development (HUD). In urging that her conviction should be overturned, Moore argues primarily that she had no duty to disclose the fact that she was her mother's daughter to the City (and hence to the federal government). She challenges her

conviction on a number of grounds related to this basic point, none of which we find persuasive. We therefore affirm the district court's judgment.

**I**

Moore's mother, Rosa Cameron, founded the Williamsburg Heights Community Block Club Association (WH) in Milwaukee. WH was a non-profit organization that Cameron established to carry out neighborhood social programs; it was largely funded by HUD block grants awarded by the City of Milwaukee. After a while, Cameron ran for and was elected to be an alderwoman on Milwaukee's Common Council. At that point, she put her daughters—first LaRosa Cameron and later defendant LaZanda Moore—in charge of WH. Throughout this time, federal HUD monies continued to flow through the City to WH. Because that funding process figures importantly in the charge against Moore, we describe it here.

Testimony at trial indicated that in recent years, HUD had provided approximately $22 million per year to the City of Milwaukee under its Community Development Block Grant (CDBG) program. Although the City is responsible for awarding and administering particular grants, its operations must comply with HUD regulations, and it must ensure that the grant recipients, such as WH, comply with HUD regulations. Each year, the City's block grant office solicits applications for funding; its staff evaluates these applications and then recommends action to the Community Development Policy Committee of the Milwaukee Common Council. Upon receiving those recommendations, that committee holds hearings to decide which organizations it wishes to fund, although individual alderpersons (both those on and those off the committee) also meet informally with the applicants from their respective geographic areas during the deliberation process. That committee's recommendations then move to the full Council and the mayor for

action. After a block grant is awarded to an organization, the organization must sign a contract with the City. The organization submits a budget, and then submits monthly activity and cost reports to the City. The City reviews the reports, and, if all is in order, it sends a check in the approved amount to the organization.

One of the HUD regulations governing this process concerns conflicts of interest. See 24 C.F.R. § 570.611(b). That regulation prohibits elected officials who participate in decisions about block grant funds from obtaining a financial benefit from a CDBG-assisted beneficiary organization, "either for themselves or those with whom they have business or immediate family ties. . . ." *Id.* The regulation specifically covers elected officials of the recipient of the HUD funds, as well as employees of subrecipients, such as WH. *Id.* § 570.611(c). This conflict-of-interest regulation was specifically incorporated into the form contracts the City of Milwaukee signed with recipients of HUD block grant funds, including WH.

Cameron was still the executive director of WH on September 1, 1999, when WH signed a block grant contract with the City for $10,089, to handle snow removal on vacant lots during 2000. Cameron and her daughter LaRosa (using the name Roberta Allen, as we explain below, and acting as WH's assistant director) signed the contract on WH's behalf, with Cameron's third daughter, Robin Bennett, signing as a witness. The City was not aware that LaRosa (or Roberta) and Robin were Cameron's daughters. Some time before the April 2000 municipal elections in Milwaukee, Cameron decided to run for alderwoman. Her plan was to get on the committee that controlled block grants, so that she could funnel more money to WH. Cameron won her election in April 2000, and was sworn in as alderwoman on April 18, 2000. Four days earlier, again acting for WH, she and "Roberta" had signed

another block grant contract with the City, this one worth $42,000, for cutting grass.

At that point, LaRosa, still using the name Roberta Allen, succeeded Cameron as the executive director of WH. Despite appearances, LaRosa's use of the name Roberta Allen was not entirely random. LaRosa's full maiden name was LaRosa Roberta Cameron; upon her marriage (four months later) on August 14, 2000, she changed her name to LaRosa Roberta Allen. Cameron's other daughters also changed their names: defendant LaZanda Moore had been LaZanda Perine before her marriage, while her sister Robin Cameron became Robin Bennett upon marriage. Moore became executive director of WH in September 2000.

In late April 2000, Assistant City Attorney Ellen Tangen explained the HUD conflict-of-interest regulations to Cameron, who by then was (as planned) a member of the Community Development Policy Committee. Tangen told Cameron that, since she had responsibility over the commitment of block grant funds, no member of her immediate family could be in a paid position at WH if WH were to receive any awards. On May 30, 2000, Cameron wrote a memo to the City Attorney stating that her husband and daughter (singular) worked at WH only as volunteers. That statement was false, as shown by payroll records at WH reflecting the fact that both Allen and Bennett were paid employees at the time. Nevertheless, the City believed that any potential conflict had been resolved because, as Tangen testified, "it appeared from the memo that the alderwoman understood the regulation and would be in compliance with it." Meanwhile, Cameron decided that she would shift the grass cutting and snow removal work from her ex-husband, Hilton Rollins, to a company Moore had formed called Perine's Maintenance. Perine's began to receive checks from WH on June 9, 2000; the first five checks were signed by Allen. Checks written after November 2000 were signed by

Moore in her capacity as executive director, and then endorsed by Moore for Perine's Maintenance— sometimes with Moore signing one name on the front of the check (Moore) and another on the back (Perine).

The next block grant awarded to WH was a full-fledged family affair. In August 2000, WH applied for the $50,000 grant; Allen signed the application as executive director and Perine (Moore) signed as secretary of WH's governing body. Cameron, as alderwoman, voted to award the grant. Neither Moore, Allen, nor Cameron ever disclosed their familial relationships during the grant process. WH paid all three of Cameron's daughters well past the date of Cameron's election to the Milwaukee Common Council: Allen received $19,935.03 in 2000; Bennett received $28,372.50; and defendant Moore received $9,794 directly, while her company Perine's received $28,449. In January 2001, Cameron again falsely told Tangen that her daughter (again singular) was just a volunteer at WH, although Allen, Moore, and Bennett were all at that point on WH's payroll. On February 20, 2001, Moore as executive director and Allen as office manager signed the form contract, which—unlike the earlier contracts that incorporated the HUD conflict-of-interest regulation—included the full text of the HUD conflict-of-interest regulation.

By May 2001, the City began to suspect that Allen was Cameron's daughter, although it did not realize that Moore might be too. It consulted with HUD and took other steps to look into the matter. Cameron continued to deceive the City, writing to the city attorney that Allen was a former employee of WH who had left, and failing to reveal that Moore was now WH's executive director.

Some of the evidence related specifically to Moore's role in the scheme. One WH employee testified that she overheard a telephone conversation between Moore and a woman from the City's block grant office in which Moore

told the woman that she had no idea that Allen was Cameron's daughter. On May 23, 2001, Juanita Hawkins, the head of the block grant office, wrote a letter explicitly quoting the conflict-of-interest regulation and noting that, "[a]ccording to a staff roster and payroll information . . . it appears that Ms. Roberta Allen, who is the daughter of Alderwoman Rosa Cameron, is a paid employee" of WH, and then also raising six additional questions about the non-profit's cost reports. Two days later, Moore wrote back, responding to the six questions about documentation; with regard to conflicts of interest, Moore wrote only, "we feel it is unmerited for you to pend [sic] our grant for the reason being 'possible conflict of interest.'" Notably, Moore did not bother to mention that she too was one of Cameron's daughters. She also remained silent in a series of conversations with other City officials who were trying to get to the bottom of the conflict problem. On August 24, 2001, Moore faxed a letter to the block grant office falsely stating that the conflict had been removed, because Allen had been gone from WH since February 27, 2001, even though payroll records showed that Allen was paid through July 15, 2001. Her letter again failed to mention that she was also Cameron's daughter. On September 5, 2001, Moore sent yet another letter to the City, asserting this time that Allen's last day of work was March 15, 2001. And, also in September, Moore signed off as executive director on another application for block grant funds, this time seeking $62,300 for crime prevention neighborhood organizing.

By the end of 2001, the game was up. Cameron tried denying to Hawkins that Moore was her biological daughter, but apparently the City had been fooled long enough, and WH lost its funding. Nevertheless, in 2001, it paid a total of $41,695 to Moore and Allen, and another $9,911 to Perine's Maintenance. The initial indictment was handed down on October 3, 2002, charging Rosa Cameron, LaRosa

Cameron (aka Roberta Allen), and LaZanda Moore with various violations of federal law. Cameron and Allen pleaded guilty, but Moore went to trial and was convicted on a superseding indictment charging only the § 1001 violation. Moore was sentenced on July 21, 2004, to two years' probation and ordered to pay a $1,000 fine.

## II

### A. Sufficiency of Indictment and Evidence

Moore raises a number of arguments on appeal, all concerning her conviction. First, she claims that the superseding indictment fails to allege facts that constitute an offense under § 1001, because it does not allege facts that "demonstrate that Moore . . . had a duty to disclose" her familial relationships. This court reviews the sufficiency of an indictment *de novo*. *United States v. Webster*, 125 F.3d 1024, 1029 (7th Cir. 1997). An indictment, according to Federal Rule of Criminal Procedure 7(c)(1), "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Webster*, 125 F.3d at 1029 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

We have identified five elements of a "false statements" charge under § 1001(a)(2), which, stated more generally, also apply to a scheme to conceal a material fact prohibited by § 1001(a)(1): (1) the defendant must make a statement, or have a duty to disclose the information; (2) the statement must be false, or there must be acts amounting to concealment; (3) the statement or concealed facts must be material; (4) the person must make the state-

ment or conceal the facts knowingly and willfully; and (5) the statement or concealed information must concern a matter within the jurisdiction of a federal department or agency. See *United States v. Ross*, 77 F.3d 1525, 1543-44 (7th Cir. 1996). Moore argues that the superseding indictment failed to meet several of these elements: first, that she had a duty to disclose; second, that she committed an affirmative act of concealment; and third, that the information she was concealing was material.

We are not persuaded by her position. The opening paragraph of the superseding indictment charged that Moore, with Cameron and Allen, "knowingly and willfully planned and executed a scheme to conceal a *material* fact, which they had a *duty to disclose*" (emphasis added). The indictment goes on to charge that the material fact in question was that "members of the immediate family of Rosa Cameron were receiving a financial benefit from Williamsburg Heights Community Block Club Association while it was being funded, in significant part, by Community Development Block Grants (CDBG) funded by the United States Department of Housing and Urban Development (HUD) and awarded by the Common Council of the City of Milwaukee." Finally, the indictment specifically charged that as part of the scheme "Moore, then serving as executive director of Williamsburg Heights, sent a letter to the City of Milwaukee Community Development Block Grants in response to an inquiry over whether Roberta Allen was a daughter of Rosa Cameron who was working for Williamsburg Heights," and that the letter from Moore falsely "stated that Roberta Allen had stopped working at Williamsburg Heights on March 15, 2001." We could go on, but this is enough to show that the indictment adequately charges the crime. Whether Moore's actions met these allegations, including whether she indeed had a duty to disclose, is another matter relating more to the sufficiency of the evidence to convict, to which we now turn.

Moore spends most of her time arguing that she had no duty to disclose her relationship with Cameron, attempting to draw a line between the prohibited conflict itself and the information she was required to disclose. When we review the sufficiency of the evidence, we ask "only if, after viewing all of the evidence in a light most favorable to the government, and drawing all reasonable inferences therefrom, . . . a rational trier of fact could not have found the essential elements of the crime, beyond a reasonable doubt." *United States v. Rivera*, 825 F.2d 152, 158-59 (7th Cir. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The government accuses Moore of characterizing the scheme too narrowly. In its view, the material fact that she had a duty to disclose was that members of Cameron's family were receiving financial benefits from WH while it was being funded by HUD block grants. Thus, the government argues, Moore had a duty to disclose not only her own relationship to Cameron, but also the fact that she, Allen, and Bennett were receiving financial benefits in the form of paychecks from WH. This duty arose both when Moore signed contracts on WH's behalf and in the course of her communications with City officials who were investigating the conflict-of-interest problem.

Our starting point in considering this argument is the language of the contracts that WH signed with the City. Importantly, these are essentially form contracts, the content of which was dictated by HUD and the terms of the block grant program. Thus, these particular contracts are the functional equivalent of any other government form. The contract covering the period from January 1, 2001, through December 31, 2001, which Moore herself signed, is typical. Article XXI of that contract is entitled "Conflict of Interest (pursuant to 24 CFR 570.611, 24 CFR 85.36 and OMB Circular A-110)." Subsections A and B specify that no officer, employee, or agent of the City (A) or member of the governing body of the locality (B) shall have any financial

interest, direct or indirect, in the contract. Subsection C reads as follows:

> Interest of Contractor and Employees. The CONTRAC-TOR covenants that no person described in Article XXI, A and B above, who presently exercises any functions or responsibilities in connection with the Contract has any financial interest, direct or indirect, in this Contract. The CONTRACTOR further covenants that he/she presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of his/her services hereunder. The CONTRACTOR further cove-nants that in the performance of this Contract no person having any conflicting interest shall be em-ployed. *An interest on the part of the CONTRACTOR or his/her employees must be disclosed to the CITY. . . .*

(emphasis added). The subsection that immediately follows replicates HUD's conflict-of-interest regulation for CDBG grants, 24 C.F.R. § 570.611, which makes clear that among the prohibited conflicts are those in which an elected official obtains a financial interest or benefit from a CDBG-funded activity either for herself or her immediate family.

While it may have been possible theoretically to cross the "t's" and dot the "i's" more perfectly in this language, its import is unmistakeable: conflicts of interest must be disclosed to the City, and one type of conflict arises when an elected official or the immediate family of an elected official benefits financially from the CDBG grant. The evidence before the jury easily permitted it to conclude that Moore, who signed this contract to obtain HUD block grant funds, knew what the standards were and deliberately avoided disclosing the conflict to the City, even when she was asked directly about it. Indeed, even if Moore did not—as she argues—read the contract and thus was ignorant for a time of her legal obligation, the continued inquiries from City

officials about the relationships between WH, Cameron, and Allen and the concerns expressed by City officials about conflicts of interest repeatedly triggered a duty to disclose. Once the City explicitly asked for the information, the failure to respond honestly is something far greater than a failure to volunteer information. The jury was entitled to conclude that Moore continued not only to withhold obviously material information from the City but affirmatively to lie.

Although Moore argues that *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987), requires us to hold that a § 1001 violation cannot be based on a failure to comply with instructions on a government form that was not itself promulgated in accordance with § 553 of the Administrative Procedure Act, we do not read *Gimbel* so broadly. In *Gimbel*, the central question was whether the defendant's bank had a duty under the Currency and Foreign Transactions Reporting Act, 31 U.S.C. §§ 5311-22, to "aggregate all transactions by one customer on one day," 830 F.2d at 625, and then to report those aggregates. Neither the Act nor the regulations imposed such a duty; the only reference to aggregation was contained in a form, which we found was insufficient to impose the duty to aggregate on the bank. In the absence of a duty to aggregate, the bank also had no duty to report aggregates.

In *Gimbel*, therefore, the problem was that the underlying substantive duty (there, aggregation) was based only on a form. In Moore's case, in contrast, the underlying duty to avoid conflicts of interest comes directly from regulations duly promulgated and codified in the Code of Federal Regulations. Those regulations are replicated in the form contract that the City used, and the contract spelled out the duty to disclose. Nothing in *Gimbel* suggests that forms or form contracts cannot perform this modest but important function. The contracts before us required WH to disclose to the City any conflicting interest on the part of WH or any of

its employees; Article XVIII also required WH to furnish to the City "such statements, records, reports, data and information as the CITY may request pertaining to matters covered by this Contract." Because this contractual duty was expressly tied to the properly promulgated federal regulations governing the CDBG program, and the City was required to adopt forms that satisfied HUD, we conclude that the duty to disclose fell within the scope of § 1001. We note as well that Moore continued to stonewall the City and on occasion to lie long after she signed the contracts. Even if she had the right to remain silent, she did not have the right affirmatively to mislead City officials or to lie about which family members were or were not on WH's payroll. See, *e.g.*, *Ross*, 77 F.3d at 1546 (upholding a § 1001 false statements conviction where Ross lied to the government by submitting a false spreadsheet even where Ross had no duty to submit the information in the first place).

The Eleventh Circuit came to a conclusion consistent with ours in *United States v. Calhoon*, 97 F.3d 518 (11th Cir. 1996), an analogous case that dealt with the Medicare program. Hospital employee Calhoon told the truth, but not the whole truth, on certain Medicare reimbursement forms. He argued that the law permitted him to claim reimbursement for costs that might in the end be nonreimbursable, and thus that doing so could not be a false statement. The Eleventh Circuit took a more nuanced approach in rejecting his position:

> While it is true that a provider may submit claims for costs it knows to be presumptively nonreimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement. Nothing less is required if the Medicare reimbursement system is not to be turned into a cat and mouse game in which clever providers could, with impunity, practice fraud on the government.

*Id.* at 529. See also *United States v. Cisneros*, 26 F. Supp. 2d 24, 42 (D.D.C. 1998) ("Since Cisneros responded to the questions, he had a duty to include all information necessary to make his statements truthful."). As with the Medicare system, the HUD block grant system could not operate if the federal government were unable to rely on recipients such as the City of Milwaukee to discover whether subrecipients like WH had conflicts of interest or violated other HUD regulations.

Moore did far more than simply remain silent in the face of an alleged duty to disclose. She told affirmative falsehoods to the City about the timing of her sister's employment at WH; at one point, she lied about Allen's relationship to Cameron; and she deliberately concealed the obviously important fact that she too was Cameron's daughter. The federal regulations, which Moore had acknowledged in the form contract, expressly forbade these dealings, and Moore had promised to follow those regulations and to furnish relevant information to the City in the governing contracts. The district court correctly refused to dismiss the indictment, and it correctly found that the evidence showed a duty to disclose based firmly in HUD's statutory program.

B.  Jury Instructions

Closely related to her challenge to the indictment and the evidence is Moore's argument that the jury instruction on duty to disclose was flawed. We review a trial court's instructions, albeit with great deference, to ensure that the instructions taken as a whole accurately state the law and are supported by the record. The instruction about which Moore complains reads as follows:

> The duty to disclose a particular fact to the executive branch of the federal government or its agent arises

from requirements in federal statutes, regulations, or government forms. When a person provides material information, that person has an obligation to refrain from telling half-truths or from excluding information necessary to make that person's statement accurate.

As Moore sees it, this instruction fails to tell the jury that it must acquit if the duty to disclose did not arise from a federal statute, regulation, or government form, and it erroneously does not inform them that 24 C.F.R. § 570.611 "does not impose such a duty and cannot be relied upon to satisfy the government's burden." We conclude that the instruction, which includes "government forms" in the list of possible sources of the duty to disclose, was adequate here. This result follows from our interpretation of the duty to disclose more generally.

Second, Moore contends that the instruction's second sentence is erroneous in that it "relieved the government of its burden to prove beyond a reasonable doubt the duty to disclose element." The answer to this argument, however, also follows from our discussion of the *Calhoon* case, *supra*. Once a person begins to provide information, as Moore did as she strove to salvage WH's grants, she must "refrain from telling half-truths or from excluding information necessary to make that person's statement accurate."

## C.  Materiality

Moore also argues that the evidence failed to show that her statements were material. In her view, they are not, because the City of Milwaukee's Ethics Code excludes from its definition of "immediate family" persons who are not receiving more than 50% of their support from the other family member. Other HUD regulations sometimes define the word "family" by reference to state-law provisions. She also argues that the information is not material because the

"financial benefit" the family members received was salary, and at a minimum the regulation's language did not clearly make the family members' salaries material.

Given the language of 24 C.F.R. § 570.611(b), we have no trouble concluding that Moore's statements were material. As we noted above, the regulation prohibits elected officials who participate in decisions about block grant funds from obtaining a financial benefit from a CDBG-assisted beneficiary organization, "either for themselves or those with whom they have business or immediate family ties. . . ." *Id.* One does not lose family ties with adult children, or other family members who are financially independent. Moreover, even if there is some residual vagueness, about which we have more to say below, that does not imply that the information is immaterial. A material statement is one that has a natural tendency to influence, or that is capable of affecting, a government function. See *United States v. Puente*, 982 F.2d 156, 159 (5th Cir. 1993). Every official involved with the CDBG program testified that family relationships were material to them. Marcia Bergeson, senior community planning and development representative for HUD, was typical: she testified that HUD considered "immediate family" to include a mother-daughter relationship, and that had the City known that Cameron's various daughters were obtaining financial benefits from WH, it would have either rejected the WH application or have required WH to request an exception. Indeed, the City's actions in repeatedly informing Cameron and WH about the potential conflicts issues and in seeking information from Cameron and her daughters about their relationships with each other and the non-profit alone would be sufficient to demonstrate the information's materiality. Finally, the great lengths to which Cameron and her daughters went to conceal their relationships with each other and with the WH payroll demonstrate quite

effectively that Cameron, Moore, and Allen knew that the information was material.

Moore next argues that the term "financial benefit" excludes salaries and that HUD at one time had interpreted the regulation in just that manner (although HUD later excised the language on which she relies). Therefore, she concludes, the fact that she and her sisters were collecting salaries cannot be material and the regulation is, in this respect as well, vague. The record shows, however, that the fact that Cameron's daughters were receiving salaries from WH had the potential to affect the City's decision on awarding block grants. The City considered the salaries to be the type of financial benefit that triggered a conflict of interest. City officials so advised Cameron from the time of her election, and they made their position clear again and again. Furthermore, a decade-old HUD interpretation based on out-of-date language in a regulation does not make those salaries any less material.

### D. Concealment

Moore also claims that she took no affirmative steps to conceal her relationship with her mother, but our account of the evidence above shows that the jury was not required to accept this view. The first problem is that here, as elsewhere in her appeal, she construes the charged offense too narrowly. As the government points out, she lied in two letters about her sister's status as an alleged former employee of WH, when the sister was still on the payroll months after the termination dates Moore supplied. Moore herself used two different names on her checks: she identified herself as Moore when writing them from WH to Perine's Maintenance, and she endorsed them as Perine on the back. The jury was entitled to regard this as at least circumstantial evidence of concealment.

E.  Vagueness of HUD Regulation

Moore offers two reasons to find the HUD conflict-of-interest regulation to be vague: first, that it does not define the term "immediate family," and second, that it does not specify whether "salary" is included in "financial benefits." This vagueness is enough, in her view, to preclude a conviction on due process grounds, because a criminal statute must provide "fair warning . . . in language that the common world will understand." *United States v. Lanier*, 520 U.S. 259, 265 (1997) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). The government counters that the alleged vagueness of the HUD regulation is irrelevant, because Moore was convicted under § 1001, not the regulation, and she is not arguing that § 1001 is too vague.

In *Bryson v. United States*, 396 U.S. 64 (1969), the Supreme Court upheld a conviction under § 1001, holding that the constitutionality of the underlying statute (§ 9(h) of the National Labor Relations Act) was irrelevant. It reasoned that "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit. One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Id.* at 68 (quoting *Dennis v. United States*, 384 U.S. 855, 867 (1966)). See also *United States v. Lawton*, 366 F.3d 550, 553-54 (7th Cir. 2004); *United States v. Weatherspoon*, 581 F.2d 595, 601 (7th Cir. 1978). The only distinction between *Bryson*, *Lawton*, and *Weatherspoon,* on the one hand, and Moore's case, on the other, is that the former involved false statements and the latter involved scheming to avoid disclosing material information. Once the duty to disclose is established, however, as we are satisfied it is here, that distinction is of no importance.

As in *Bryson*, the jury in this case necessarily found that Moore acted knowingly or intentionally. Her conviction does

not depend on any mistake of law with regard to the scope of the HUD regulations as reflected in Milwaukee's form contract. It rests instead on her repeated decisions to avoid revealing her relationship with Cameron, to give false information about her sister's continued employment at WH, and to provide misleading information designed to throw the City off the track. The City unquestionably had the authority to ask Moore the questions it did, and the information she gave and withheld was material. That is enough.

### III

Moore, along with her other family members, engaged in a scheme to conceal material facts from the City of Milwaukee, in its role as administrator of federal block grant funds. Specifically, she withheld material facts from the City and consequently HUD about the family's violation of the conflict-of-interest rules. Finding no merit in any of her arguments, we AFFIRM the judgment of the district court.

No. 04-2989                                                    19

A true Copy:

    Teste:

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*